PARTIDO NUEVO PROGRESISTA Y OTROS, demandantes y recurrentes, *v.* DARÍO HERNÁNDEZ Y OTROS, demandados y recurridos.

*Número:* RE-88-328     *Resuelto:* 14 de septiembre de 1988

*Hipólito F. Ortiz Ballester, Miguel Pagán* y *Eliezer Aldarondo Ortiz,* de *Aldarondo & López Bras,* abogados de los recurrentes; *Rafael Ortiz Carrión, Procurador General,* abogado de los recurridos.

## SENTENCIA

Examinados los planteamientos del recurrente Partido Nuevo Progresista a la luz de la comparecencia de los demandados recurridos Departamento de Transportación y Obras Públicas y su Secretario, Ing. Darío Hernández, *et al.*, y tomando en consideración el hecho de que no se obtuvo la autorización previa de la Comisión Estatal de Elecciones, en reconsideración se expide el auto y se dicta sentencia revocatoria de la del Tribunal Superior, Sala de San Juan, de 20 de julio de 1988, y en su lugar se expide el *injunction* y se ordena a los demandados recurridos la prohibición inmediata de los anuncios que está difundiendo en los distintos medios de comunicación pública el Departamento de Transportación y Obras Públicas.

Simultáneamente con este mandato, se devuelve el caso al foro de instancia para que éste, conservando su jurisdicción, posponga su intervención hasta que la Comisión Esta-

tal de Elecciones, en un plazo no mayor de cinco (5) días, proceda a resolver si dichos anuncios son permisibles a la luz del Art. 8.001 de la Ley Electoral de Puerto Rico vigente, 16 L.P.R.A. sec. 3351.

Así lo pronunció y manda el Tribunal y certifica el señor Secretario General. Todos los Jueces concurren con este dictamen y se reservan el derecho a certificar su posición conforme la Regla 4(b) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I-A. El Juez Asociado Señor Negrón García emitió opinión concurrente. El Juez Asociado Señor Rebollo López emitió opinión concurrente, a la cual se une el Juez Asociado Señor Ortiz. El Juez Asociado Señor Hernández Denton se inhibió.

(*Fdo.*) Bruno Cortés Trigo
*Secretario General*

—O—

Opinión concurrente emitida por el Juez Asociado Señor Negrón García.

"[L]a levadura que hace crecer nuestro sistema democrático es el libre intercambio y el choque pacífico de ideas. La igual oportunidad económica para diseminarlas es requisito indispensable y consustancial a ese postulado." *P.S.P. v. Srio. de Hacienda*, 110 D.P.R. 313, 327 (1980). "La regla de oro de las democracias contemporáneas radica en la convicción generalizada acerca de la posibilidad competitiva para la accesión al poder, sólo y únicamente cuando los más vastos sectores sociales de una comunidad comparten la creencia cierta en torno a la viabilidad de la disputa según las 'reglas del juego', entonces el régimen goza de la perspectiva de un consenso en grado de legitimidad, que asegura la deposición de la conjura para la inserción de las mayorías en la leal adversidad. Que el sentimiento de los triunfos y de las derrotas no asuma la proporción de un dato de inapelabilidad en el

futuro, es fundamental para que la democracia permita la repetición del acto verificatorio del consenso, en el cual los derrotados de ayer puedan convertirse en los triunfadores de hoy, y donde los gananciosos del presente puedan trocarse en los perdidosos del mañana." J.R. Vanossi, *Los partidos políticos y los presupuestos de la democracia*, 1980-D Rev. Jur. Arg. La Ley 1287 (1980).

Bajo este prisma —conforme anticipáramos el pasado viernes 9 de septiembre— con miras a darle virtualidad inmediata al ideal constitucional y legislativo de *igualdad en el debate político*, coincidimos con la expedición del auto y revocación de la sentencia del Tribunal Superior, Sala de San Juan (Hon. Pedro López Oliver, Juez), que denegó el entredicho provisional e *injunction* preliminar solicitado por el Partido Nuevo Progresista (P.N.P.) contra el Secretario del Departamento de Transportación y Obras Públicas (T.O.P.), Ing. Darío Hernández. Como consecuencia, procede la paralización de una serie de anuncios que recientemente ha estado difundiendo dicho departamento (T.O.P.) por la prensa escrita, radial y televisiva denominados "pítale a la basura". Conjuntamente con este dictamen, por imperativo, se ha ordenado a la Comisión Estatal de Elecciones que prontamente determine la procedencia o no de los mismos.

## I

Esta controversia tiene su génesis directa ante el foro judicial en virtud de dos (2) demandas de entredicho provisional, interdicto preliminar y permanente incoadas por el P.N.P. —representado por su Comisionado Electoral, Francisco González, Jr.— con el propósito de cuestionar la legalidad e impedir que se continúen publicando ciertos anuncios con fondos públicos por dicho departamento y el Departa-

mento de Estado,(1) bajo la alegación básica de que los mismos *no* han sido previamente autorizados por la Comisión Estatal, según requerido por el Art. 8.001 de la Ley Electoral de Puerto Rico, según enmendada, 16 L.P.R.A. sec. 3351. Bajo juramento, dicho Comisionado Electoral adujo que ante la Comisión Estatal de Elecciones "se ha opuesto y se opone a las prácticas ilegales que motivan el presente recurso". *Exhibit* IV, pág. 6.

El mismo día de su presentación —20 de julio— la ilustrada sala de instancia declinó ejercer su jurisdicción y denegó el pedido al concluir que el P.N.P. debió ir primeramente a la Comisión Estatal de Elecciones. Ese decreto sumario, aunque paralizó todo trámite ulterior en instancia, no puso fin a la controversia. Inconforme, dos (2) días después —con premura— el P.N.P. acudió a este Foro y *notificó al Departamento de Transportación y Obras Públicas y al Secretario de Justicia de sus alegaciones y reclamo.* Ninguno de ellos compareció a oponerse dentro del término reglamentario. El 18 de agosto —notificada el 23— una sala de despacho de verano integrada por el Juez Presidente Señor Pons Núñez y los Jueces Asociados Señores Rebollo López y Alonso Alonso, proveyó *no ha lugar* al recurso. Por la importancia y recurrencia del asunto, acogimos un pedido de reconsideración formulado el 29 de agosto. En justicia, cabe destacar que es en la reconsideración por *vez primera* que se nos señala la política oficial del Gobierno cimentada en una opinión del Secretario de Justicia que oportunamente analizaremos. Se convocó a una sesión plenaria celebrada el 9 de septiembre y, como resultado, se instruyó a la agencia recurrida que

---

(1) En su moción de reconsideración ante nos, el Partido Nuevo Progresista (P.N.P.) desiste del recurso contra el Departamento de Estado por anuncios referentes a la celebración del día de la Constitución del E.L.A., 25 de julio de 1988. El simple transcurso del tiempo tornó académico, en parte, ese reclamo. Según expondremos, la situación es más grave en su proyección prospectiva de anuncios masivos.

compareciera. El 12 de septiembre ésta y el Secretario de Justicia presentaron su escrito.

## II

La cuestión es trascendental. La reivindicación de principios constitucionales y electorales exigen nuestra más pronta intervención y completa adjudicación. "[C]on apoyo en nuestras decisiones de *Otero Martínez* v. *Gobernador*, 106 D.P.R. 552, 556 (1977), *Febres* v. *Feijoó*, 106 D.P.R. 676, 681 (1978), *Pierson Muller I* v. *Feijoó*, 106 D.P.R. 838, 851 (1978) y *Pedraza Rivera* v. *Collazo Collazo*, 108 D.P.R. 272 (1979)[,] la intervención del foro judicial no está subordinada a normas de jurisdicción primaria y agotamiento de la esfera administrativa, cuando concurren los siguientes factores: (a) existe un reclamo sustancial de que la actuación administrativa lesiona derechos constitucionales de una parte; (b) *se puede trazar una línea y distinguir entre situaciones de interpretación estatutaria y constitucionales en que la competencia y destreza del foro judicial es evidente, y aquellos en que se manifiesta la especialidad o pericia (expertise) acumulativa*[,] y (c) se puede tornar en ilusorio y académico el derecho reclamado." (Énfasis suplido.) *P.S.P.* v. *Srio. de Hacienda*, supra, pág. 317. Sólo así hacemos realidad y refrendamos el inestimable postulado de alta moralidad en la administración de fondos públicos que inspiró el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, que dispone:

> Se *prohíbe* a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, *incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.*

Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de *interés público, urgencia o emergencia*, los cuales *sólo serán permitidos previa autorización al efecto* de la Comisión Estatal de Elecciones. (Énfasis suplido.)

Para implantar esta prohibición, el 11 de diciembre de 1987 la Comisión Estatal de Elecciones aprobó el Reglamento de Gastos de Difusión Pública del Gobierno (Reglamento de Gastos). En su declaración de propósitos, en lo pertinente, expone su ámbito, a saber:

. . . evitar la divulgación publicitaria indiscriminada con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes del gobierno que en alguna forma coaccionen o afecten la voluntad de los electores.

Por otro lado, el gobierno[,] por el consentimiento de los gobernados, principio rector de la democracia, tiene la responsabilidad de poner en conocimiento de los ciudadanos, diversos aspectos de interés público, urgencia y de emergencia con el fin de proteger su bienestar, hacer valer sus derechos y conocer sus responsabilidades, *los cuales s[ó]lo serán permitidos previa autorización al efecto de la Comisión en los casos pertinentes.* (Énfasis suplido.) Reglamento de Gastos, *supra*, Sec. 1.2, págs. 1–2.

A su vez, las Secs. 2.1 y 2.2 del Reglamento de Gastos, *supra*, disponen que:

Sección 2.1 - *SOLICITUD DE AUTORIZACION*
Toda agencia que, directa o indirectamente, proyecte incurrir en gastos en el uso de cualquier medio de difusión para emitir cualquier información que considere de interés público, tendrá que someter previamente una solicitud de autorización ante la Comisión.

Sección 2.2 - *RADICACION DE SOLICITUD DE AUTORIZACION*
Toda solicitud de autorización deberá radicarse, en original y cinco (5) copias ante el Secretario, *con no menos de quince (15) días laborables de anticipación* a la fecha en que la agencia proyecte iniciar la emisión del anuncio. (Énfasis suplido.) Reglamento de Gastos, *supra*, págs. 4–5.

Bajo la Ley Electoral de Puerto Rico y el Reglamento de Gastos mencionados, surge diáfanamente la obligación de toda agencia de someter la solicitud de autorización para permitir la publicación con quince (15) días laborables de anticipación a la fecha de su proyectada publicación. La única excepción a este trámite de autorización ante la Comisión Estatal de Elecciones son los avisos autorizados expresamente por ley. Todos los demás necesitan autorización previa, salvo los de *emergencia*, en cuyo caso la agencia tiene que presentar una justificación ante dicho organismo que acredite las razones que mediaron para obviar el procedimiento; ello dentro de las cuarenta y ocho (48) horas siguientes.

Finalmente, el Reglamento de Gastos define varios conceptos que, por su pertinencia, copiamos:

5. *Información de interés público* - Toda divulgación que afecte en forma significativa los derechos, las obligaciones, o el bienestar de la ciudadanía en general, en el ámbito de responsabilidad de cada agencia del gobierno, según sus deberes y funciones y que por ser vital e indispensable se requiere que la ciudadanía advenga en conocimiento de la información propuesta.

7. *Logros* - Las metas o el éxito alcanzado por una agencia en el desempeño de sus deberes y funciones.

10. *Programa* - Un mandato o curso de acción a seguir por las agencias del gobierno en el desempeño de sus deberes y funciones.

12. *Proyecto* - La identificación de propósitos definidos para ejecutar, una determinada actividad, en un plazo razonablemente limitado.

13. *Realizaciones* - Las tareas o ejecutorias cumplidas o llevadas a cabo por una agencia en el descargo de sus deberes y funciones.

14. *Urgencia o Emergencia* - Situación de carácter súbito o imprevisto, ocasionada por actos del hombre o de la natura-

leza, que requiere la inmediata divulgación de información por una agencia, según el ámbito de sus deberes y funciones, a los fines de proteger la vida, propiedad o los derechos de la ciudadanía. Reglamento de Gastos, *supra*, Sec. 1.4(5), (7), (10), (12), (13) y (14), págs. 3–4.

Estas definiciones ponen de manifiesto la amplia y multidimensional cobertura que conlleva la prohibición de la ley. A tal efecto, el Reglamento de Gastos, *supra*, Sec. 6.1, pág. 10, dispone que "[l]a autorización para que se incurra en gastos de difusión en el período comprendido entre el 1ro. de enero y hasta el día siguiente al día de elecciones generales, *constituye una excepción a la prohibición de la ley*, por lo que *recaerá sobre la agencia el peso de la prueba* para demostrar que el gasto propuesto en la solicitud *no se hace* con el propósito de exponer programas, proyectos, logros, realizaciones, proyecciones o planes". (Énfasis suplido.)

## III

En *P.P.D. v. Junta Revisora Electoral*, 109 D.P.R. 464 (1980), dicho partido político nos argumentó que el "propósito obvio de esta disposición es protejer a los partidos de minoría *de los efectos que la publicidad de las agencias del gobierno pueden producir a favor del partido que les controle*". (Énfasis suplido.) Solicitud de revisión, pág. 3. Y más adelante, con referencia al riesgo y daño de una adjudicación y autorización errónea de la Junta Revisora Electoral, con vehemencia expuso que "[u]na vez publicado el anuncio *no sirve de nada la impugnación de los partidos de minoría*". (Énfasis suplido.) Íd. Al reconocer la fuerza persuasiva de esos señalamientos, en nuestro voto disidente indicamos que la ley "intenta lograr los siguientes objetivos: (a) directamente, evitar que las agencias gubernamentales usando fondos públicos y so pretexto de exponer sus ejecutorias o planes, realicen solapadamente campaña política en favor del partido en el poder y aquellos incumbentes que aspiran nue-

vamente a ser electos; (b) reducir las ventajas reconocidas que gozan los candidatos incumbentes —a través del acceso a los electores y público en general por medio de la televisión, prensa y radio— que el solo ejercicio y exposición del cargo conlleva sobre sus opositores; y (c) indirectamente, frenar los excesos y economizar al erario público y a los contribuyentes los gastos ordinarios de publicidad en año de elecciones". *P.P.D. v. Junta Revisora Electoral*, supra, pág. 467.

Ocho (8) años después, reafirmamos sin ambigüedades la validez de esos argumentos y nuestros pronunciamientos. Es evidente que durante año eleccionario, por mandato legislativo, la Ley Electoral de Puerto Rico veda de manera absoluta —a menos que medie autorización de la Comisión Estatal de Elecciones— todo gasto de difusión pública por el Gobierno y sus agencias, excepto los "avisos y anuncios de prensa expresamente requeridos por ley". 16 L.P.R.A. sec. 3351. Los anuncios de interés público requieren igual trámite y, aun los de urgencia o de emergencia, exigen autorización *a posteriori*. La proscripción de gastos por propaganda política, sea directa o indirecta, es total e impermisible y no tolera excepciones. Aun cuando la Ley Electoral de Puerto Rico guardara silencio al respecto, subsistiría el principio igualitario constitucional de que los desembolsos públicos para fines de propaganda política no son lícitos ni tolerables. Ante reclamos meritorios, los tribunales tienen la facultad inherente para impedir, reivindicar y remediar infracciones a ese derecho. Después de todo, "[a]l presente, en materia electoral no se cuestiona seriamente el postulado de igualdad inmerso en nuestra Constitución. Históricamente ese ideal ha cobrado vida en el esquema integral financiero trazado por la Asamblea Legislativa para lograr paridad económica entre los partidos políticos y los candidatos". *Marrero v. Mun. de Morovis*, 115 D.P.R. 643, 646 (1984); *P.S.P. v. Srio. de Hacienda*, supra.

La doctrina constitucional vigente reconoce, como objetivos legítimos consustanciales al proceso democrático, la facultad de imponer limitaciones tendentes a evitar la competencia injusta, la desigualdad económica y las ventajas en el proceso electoral. En *P.N.P. v. Tribunal Electoral,* 104 D.P.R. 741, 750–751 (1976), al profundizar sobre el axioma de igualdad electoral que impregna la Constitución, reconocimos:

> Ante los adelantos técnicos de comunicación rápida, directa y masiva, el libre intercambio y la fluidez de ideas y la discusión en torno a los asuntos públicos y las cualificaciones de los candidatos, dependen en gran medida de la capacidad económica de éstos y los partidos políticos. El mensaje personal de antaño en las lides electorales puertorriqueñas es hoy la excepción, descansándose cada vez más en los medios electrónicos de difusión moderna. . . .
>
> De gran significación al caso que nos ocupa es el siguiente pensamiento plasmado en el Informe de la Carta de Derechos de la Convención Constituyente: "El más amplio reconocimiento del derecho a diferir y *ser, no obstante, tratado con igualdad y protegido en esa diferencia por el poder público,* es uno de los rasgos definidores de la democracia liberal. De esta disposición suya a convivir con el opositor y *darle plena oportunidad para que en el debate político* cambie de crítico en dirigente cuando gane la confianza electoral, deriva buena parte de su fuerza creadora y renovadora. Es éste el único régimen que se complace en el vigor fecundante de las diferencias mantenidas en *el marco de una lealtad básica a los principios y a la metodología de la democracia".* (Énfasis suplido y en el original.)

En este sentido es claramente errónea y de poco valor persuasivo la opinión del Secretario de Justicia Interino, Lic. Guillermo Mojica Maldonado, emitida el 27 de junio de 1988 a ruego de la Secretaria de Estado, Hon. Sila M. Calderón, interpretando el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra,* que nos ocupa. La misma concluye que, salvo los anuncios de carácter proselitista, los demás "pueden ser pu-

blicados por las agencias concernidas sin necesidad de obtener la autorización de la Comisión Estatal de Elecciones". Apéndice 7, pág. 019. Esa opinión, reafirmada el 15 de agosto de 1988 por el Secretario de Justicia, Lic. Héctor Rivera Cruz —como "política pública de esta Administración"— es contraria e irreconciliable con el historial legislativo, el espíritu y el texto de la ley. Tiene el efecto negativo de circunvalar el cauce administrativo y autorizar anuncios gubernamentales en año de elecciones generales sin que la Comisión Estatal de Elecciones pase juicio sobre su carácter. No sólo anula la prohibición, sino que se apuntala en el razonamiento circular equivocado de que únicamente es menester requerir permiso a la Comisión Estatal de Elecciones cuando *los propios secretarios o jefes de agencia del E.L.A.* hagan su peculiar y conveniente interpretación sobre el contenido de los anuncios respecto a logros, proyecciones, programas o planes.

Así implantada, se ha privado a la Comisión Estatal de Elecciones de la facultad y función de determinar si el anuncio cae o no dentro de las excepciones del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra,* o es uno prohibido de manera absoluta. Lamentablemente esa interpretación derrota y choca con los encomiables objetivos de moralidad y sana administración pública que el legislador previó. Para todos los fines prácticos, en el ámbito constitucional y electoral dicha opinión, aceptada por todo el actual Gobierno, ha cambiado *las reglas de juego* y sienta un peligroso precedente. En lugar de propiciar y fortalecer el cumplimiento de la ley, promueve su inobservancia y debilita nuestra democracia. Deja en manos exclusivas de las agencias la procedencia y licitud de determinar los gastos con fondos públicos en materia publicitaria. Por tal razón, sin vacilaciones, debe quedar sin efecto. Cuando la letra de un estatuto es clara, no hay necesidad alguna de acudir al historial legislativo bajo el pretexto de cumplir su espíritu y estar en condiciones de inter-

pretarlo. *Meléndez Ortiz v. Valdejully*, 120 D.P.R. 1 (1987); *Ferretería Matos, Inc. v. P.R. Tel. Co.*, 110 D.P.R. 153, 156–157 (1980). Como secuela, la primera obligación del jurisprudente es examinar el texto para apreciar si su sentido es claro. En esa tarea, no es posible atribuirle al legislador móviles que no expresó o absurdos contrarios a la técnica que deliberadamente utilizó. *Pueblo v. Burgos Torres*, 120 D.P.R. 709 (1988). En el mismo espíritu, en buena hermenéutica, toda excepción en un estatuto debe interpretarse restrictivamente. *Banco Central y Economías v. Registrador*, 111 D.P.R. 773 (1981).

Bajo este enfoque, repetimos, la prohibición estatutaria es tajante y absoluta en cuanto a materia de propaganda política —sea clara, indirecta, sutil, disimulada o sofisticada— y relativa en cuanto a materia no proselitista. En cualesquiera de las alternativas apuntadas, siempre hay que acudir a la Comisión Estatal de Elecciones para el correspondiente permiso. El funcionario que injustificadamente omita ese trámite, incurre en una crasa violación a la ley, se expone a responsabilidad personal —por autorizar pago ilegal— y a ser encauzado y sancionado penalmente con reclusión no mayor de tres (3) meses o multa máxima de $300, o ambas penas a discreción del tribunal correspondiente. 3 L.P.R.A. sec. 283h(g); Art. 8.005 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3355; Reglamento de Gastos, *supra*, Sec. 9.5, pág. 14.

Para velar el estricto cumplimiento de la ley, la Sec. 7.1(A) del Reglamento de Gastos, *supra*, pág. 11, fija un procedimiento de intervención discrecional — "podrá", expresa su lenguaje— de investigación e información a ser suministrado por las agencias en cuanto a anuncios que se difunden sin o con la autorización, y establece un requerimiento de comparecencia. La agencia así citada deberá comparecer ante la Comisión Estatal de Elecciones o sus oficiales examinadores y brindar la información requerida. Estos oficiales

evaluarán toda solicitud de autorización y rendirán un informe dentro de los cinco (5) días siguientes a su presentación. A los tres (3) días siguientes, la Comisión Estatal de Elecciones actuará.

Como veremos, las gestiones del recurrente P.N.P. ante dicho organismo, por las posiciones coincidentes de distintos funcionarios gubernamentales en virtud de una política oficial preestablecida y trámites habidos, son de insatisfactoria demora. El resultado neto es que al día de hoy, desde hace varias semanas, sin autorización legal, continúan sin control y agotándose los fondos públicos en esos anuncios.

IV

Contra este trasfondo evaluamos el recurso. El foro de instancia, al dictar sentencia, tomó como cierta la alegación en la demanda jurada de que el Departamento de Transportación y Obras Públicas no cumplió con su obligación de presentar una solicitud de autorización con quince (15) días de anticipación. En otras palabras, hasta el presente los anuncios no han sido autorizados por la Comisión Estatal de Elecciones. Para fines decisorios seguimos igual enfoque, incluyendo la alegación expositiva de "[q]ue de mantener[se] la publicación en prensa, radio y televisión de los anuncios a que hemos hecho referencia sin la previa autorización de la Comisión Estatal de Elecciones, se estaría causando un daño irreparable al Partido Nuevo Progresista, al no estar éste en igualdad de condiciones en cuanto a publicidad se refiere conforme a la intención del legislador, al aprobar las disposiciones legales antes mencionadas". *Exhibit* IV, pág. 8.

Durante todo el trámite apelativo iniciado el 22 de julio de 1988, el Departamento de Transportación y Obras Públicas no compareció a este Foro a oponerse al recurso. Únicamente lo hizo en atención a una resolución del tribunal de 9 de septiembre. Su comparecencia, en vez de lograr superar, aclara la dimensión e importancia del recurso y, en definitiva,

comprueba la ilegalidad del proceder de la agencia. Interesantemente, el Departamento de Transportación y Obras Públicas, requerido por la Comisión Estatal de Elecciones de que se expresara sobre la publicación de sus anuncios, el 29 de julio —hace mes y medio— pidió que la Comisión Estatal de Elecciones aplazara su comparecencia "hasta tanto el Hon. Tribunal Supremo de Puerto Rico [tuviera] la oportunidad de atender y disponer adecuadamente" de este recurso. Apéndice 3, pág. 007. Hoy, después de transcurrido tanto tiempo —a escasos cincuenta y cinco (55) días de las elecciones— nos pide que nos abstengamos de decidir y, simplemente, sin interdicto ni cualificación alguna, devolvamos el asunto a la Comisión Estatal de Elecciones.

No podemos acceder. Desde hace varios días hemos insistido que el tiempo apremia. De su faz, estamos ante una flagrante violación de la Ley Electoral de Puerto Rico que por diversas vicisitudes procesales, tardanzas insuperables, ambivalencias y posiciones contradictorias no ha sido expeditamente atendida en el organismo administrativo. Pocas veces se nos ha planteado un caso tan claro que amerite urgentemente apartarse del curso administrativo. Expongamos los múltiples fundamentos que justifican nuestro *injunction*.

*Primero*, como único curso procesal remedial por el carácter diario, repetitivo, continuo y recurrente del acto ilegal y daño irreparable. Después de todo, aunque es argüible que la ilegalidad de los anuncios, per se, es causa suficiente para no autorizar el desembolso, y que el Secretario de Hacienda o funcionario de la agencia no viene obligado a pagar por los mismos, *no* podemos olvidar la vigencia del argumento del Partido Popular Democrático (P.P.D.) antes citado, de que "[u]na vez publicado el anuncio no sirve de nada la impugnación de los partidos de minoría". Solicitud de revisión, *supra*, pág. 3. *No hay forma cabal de neutralizar los posibles efectos publicitarios adversos partidistas de anuncios pagados con fondos públicos de ostensible ilegalidad.* Como corola-

rio, la labor clásica de diseñar judicialmente un resarcimiento pecuniario por los daños experimentados a los partidos minoritarios políticos de oposición y sus electores es que, aunque posible, puede resultar tardía, compleja y de difícil cuantificación.(2)

*Segundo*, ciertamente la petición del P.N.P., enmarcada dentro de los parámetros establecidos por la Regla 57.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y los Arts. 677 y 678 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 3523 y 3524, respectivamente, hacían procedente la solicitud de entredicho provisional y de interdicto preliminar. La misma establecía la existencia de un reclamo cimentado en la violación patente e inminente de un derecho de rango constitucional y estatutario —igualdad económica en el debate público político-partidista— cuya intensidad justificaba su expedición. *García Cabán v. U.P.R.*, 120 D.P.R. 167 (1987); *Otero Martínez v. Gobernador*, supra; *A.P.P.R. v. Tribunal Superior*, 103 D.P.R. 903, 906 (1975).

*Tercero*, aunque en justicia cabe aclarar que al ilustrado foro de instancia no se le produjo el señalamiento en torno a la opinión e interpretación del Secretario de Justicia y su efecto derogatorio del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, no obstante, al fundamentar su dictamen sumario en las Secs. 8.1 y 8.2 del Reglamento de Gastos, *supra*, pág. 12,(3) pasó por alto que las circunstancias ex-

---

(2) En ausencia de otro remedio, la evolución jurisprudencial no puede descartar la posibilidad de que los tribunales puedan exigir —con cargo al fondo electoral del partido político que promueve el anuncio ilegal— que se conceda a los partidos minoritarios de oposición una cantidad global pecuniaria equivalente al costo del anuncio, de modo que éstos puedan utilizarla con el fin de contrarrestarlos.

(3) Disponen:
"DECISIONES Y ORDENES DE LA COMISION
"Sección 8.1 - *MEDIDAS A TOMARSE*
"En adición a las funciones descritas en la Sección 5.6 con relación a las recomendaciones de los Oficiales Examinadores, la Comisión podrá emitir cual-

puestas en la petición eran suficientes y justificaban desviarse del cauce administrativo. El P.N.P. y su Comisionado Electoral adujeron que ante la Comisión Estatal de Elecciones éste se había opuesto a esas prácticas ilegales y, como daño, a la desventaja inmediata que conllevaban los anuncios respecto a sus adversarios políticos, en tanto el Gobierno y las agencias —controlados por el P.P.D.— alegadamente estaban incurriendo en gastos públicos con fines propagandistas. Aunque incompleto, emergía de ese modo, trágicamente, el rostro de la figura patológica de la *partidocracia* como anatema de una verdadera *democracia.*

*Cuarto*, desde el punto de vista jurisprudencial y de los principios que la informan, la doctrina de agotamiento de remedios administrativos o de jurisdicción primaria no era impedimento para que el tribunal de instancia atendiera los legítimos reclamos del P.N.P. Las gestiones infructuosas de su Comisionado Electoral ante la Comisión Estatal de Elecciones y las posiciones en contrario de los funcionarios de las agencias, siguiendo la política oficial expuesta en la opinión del Secretario de Justicia, justificaban la intervención directa judicial.

*Quinto*, la importancia de una pronta adjudicación no era ni es susceptible de minimizarse bajo la tesis de agotamiento

---

quier decisión que estime necesaria para asegurar la efectividad de la ley y de este reglamento, y podrá ordenar cualquier medida que estime apropiada, según las circunstancias del caso.

"Cuando la Comisión ordenare a una agencia la suspensión o modificación de cualquier información difundida o difundiéndose y ésta no cumpliere con dicha orden, podrá interponer el remedio legal que estime procedente para hacer cumplir la misma.

"Sección 8.2 - *REVISION DE LAS DECISIONES DE LA COMISION*

"La revisión de las decisiones de la Comisión se regirán por las disposiciones del Artículo 1.016 de la Ley Electoral de Puerto Rico, que dispone que cualquier parte afectada por una resolución de la Comisión podrá, dentro de los diez (10) días siguientes a la notificación de la misma, recurrir ante el Tribunal Superior mediante la radicación de un Escrito de Revisión." Reglamento de Gastos de Difusión Pública del Gobierno (Reglamento de Gastos), Secs. 8.1 y 8.2, pág. 12.

de remedios que encontró eco en la ilustrada sala sentenciadora. Tampoco enervaba esa intervención el que algunas alegaciones no fueran un modelo perfecto de redacción forense. La clara violación legal por el Departamento de Transportación y Obras Públicas, y la sustancia del reclamo del P.N.P. en la órbita electoral-constitucional, rebasaba ese tipo de razonamiento. Desde este estrado apelativo rechazamos igual técnica dispositiva. El carácter del pleito —de consecuencias y móviles políticos— no desvirtúa, sino que fortalece la naturaleza eminentemente justiciable de la controversia y de la cualidad jurídica de los remedios invocados, a saber, la ilegalidad en el uso de los fondos públicos y la desigualdad creada entre los partidos políticos de oposición. *P.S.P. v. Srio. de Hacienda,* supra; *P.S.P., P.P.D., P.I.P. v. Romero Barceló,* 110 D.P.R. 248 (1980); *Ortiz Angleró v. Barreto Pérez,* 110 D.P.R. 84 (1980); *Santa Aponte v. Srio. del Senado,* 105 D.P.R. 750 (1977); *Clemente v. Depto. de la Vivienda,* 114 D.P.R. 763, 770–771 (1983).

## V

No comprendemos, pues, cómo todavía pueda argumentarse la necesidad de una intervención original o primaria de la Comisión Estatal de Elecciones cuando el sustrato de la causa de acción esgrimida era y es la ilegalidad de un acto y su impacto constitucional, agravado por la interpretación original y subsiguiente del Secretario de Justicia.

*La futilidad de ese trámite administrativo es evidente.* En primer lugar, fue el propio Secretario de Transportación y Obras Públicas quien, desde el 29 de julio de 1988, curiosamente le solicitó a la Comisión Estatal de Elecciones que no dilucidara la legalidad del anuncio en controversia para poder contar "con el beneficio del dictamen, si alguno, que pu[diera] recaer" por este Tribunal en el recurso. Apéndice 3, pág. 007. ¿De qué se queja? ¿Cómo pedirnos ahora todo lo contrario? Segundo, pendiente la reconsideración de este re-

curso, desde el 15 de agosto de 1988 el Secretario de Justicia, Lic. Héctor Rivera Cruz, les había comunicado a los comisionados electorales del P.N.P. y del Partido Independentista Puertorriqueño (P.I.P.) —por vía de contestación a una carta de 4 de agosto del Presidente de la Comisión Estatal de Elecciones, Lic. Marcos A. Rodríguez Estrada— su postura final de que no era necesaria la previa autorización del anuncio, según antes indicado, y que ello representaba la política pública definitiva del Gobierno actual. De este modo reiteraba como correcta su interpretación y quedaba trabada, sin ambajes, una controversia de exclusiva naturaleza jurídica.

Ya el 27 de agosto de 1988 el recurrente P.N.P., a través de su Comisionado Electoral, Lic. Francisco González, Jr., exponía nuevamente su oposición a esa interpretación y se quejaba en la Comisión Estatal de Elecciones contra el desembolso así de fondos públicos. ¿Cómo insistir seriamente en esta etapa que deneguemos el *injunction* y remitamos la cuestión al cauce administrativo plagado de vaivenes dilatorios?

Más aún, el propio Secretario de Justicia, en su aludida opinión de 15 de agosto —hace más de un (1) mes— *reconoció y admitió el carácter estrictamente justiciable de la cuestión.* En la misma, *in fine,* consignó: "Entendemos que esta es la interpretación correcta del referido Artículo de la Ley Electoral. Naturalmente, esta Administración *acataría fielmente cualquier otra interpretación* que los *tribunales le impriman* al referido Artículo, de surgir un procedimiento que resulte en una *adjudicación del asunto por poder judicial.*" (Énfasis suplido.) Apéndice 10, pág. 026. Ante esta posición oficial, ¿qué acuerdo podría resultar en la Comisión Estatal de Elecciones? El acuerdo final de dicho organismo, ¿no estaría predestinado a ser revisado por los tribunales? ¿Por qué se persevera en posponerla? La interpretación de las leyes es función clásica, de excelencia, que compete a los tribunales. Es obvio que la interpretación definitiva del al-

cance de la opinión del Secretario de Justicia era y es materia judicial que trascendía la destreza de la Comisión Estatal de Elecciones como organismo administrativo. Ya lo reconoció el propio Secretario de Justicia; ¿por qué negar esa realidad ahora? Recuérdese que cada día de demora representa un aumento acumulado de gastos de fondos públicos por anuncios de su faz ilegales y un daño irreparable al P.N.P. y a sus electores. Es urgente y apremiante, pues, una decisión judicial al respecto.

Lo expuesto nos mueve, en buena metodología adjudicativa, que antepongamos lo sustantivo sobre lo adjetival. Evitamos confundirnos y caer —al decir de Calamandrei— en el pecado grave de "haber separado el proceso de su finalidad social; haber estudiado el proceso como un territorio cerrado, como un mundo por sí mismo, haber pensado que se podía crear en torno al mismo una especie de soberbio aislamiento separándolo cada vez de manera más profunda de todos los vínculos con el derecho sustancial, de todos los contactos con los problemas de sustancia; de la justicia, en suma. . . . A todos nosotros, los abogados [y Jueces] nos ocurre frecuentemente, y en esta última década nos ha ocurrido acaso más a menudo que antes, tener que admirar ciertas sentencias que son verdaderos monumentos de doctrina jurídica, sin poder ahogar, sin embargo, en nosotros, al final de su lectura, una sensación de descontento y desagrado, de la cual surge una secreta pregunta que no encuentra contestación en aquel despliegue de erudita dialéctica". Citado en C.R. Sanz, *Sobre el derecho y el proceso*, 1983-B Rev. Jur. Arg. La Ley 875, 883 esc. 71 (1983).

## VI

Para el P.N.P. —como representantes de una colectividad ciudadana con interés genuino en impugnar los anuncios— la omisión y acción gubernamental cuestionadas se planificaron de antemano y proyectaron como hechos consumados, inves-

tidos con el sello de regularidad jurídica y el respaldo oficial que conlleva, en principio, toda actuación administrativa. Máxime a la luz de la errónea opinión del Secretario de Justicia —rubricada por la Secretaria de Estado— quien, al tenor de la misma, publicó sin permiso de la Comisión Estatal de Elecciones un anuncio sobre una actividad que se celebró el pasado 4 de julio en conmemoración de la independencia de Estados Unidos, y el 21 de julio dirigió un memorando a los "Secretarios de Departamentos, Jefes de Agencias y Directores Ejecutivos de Corporaciones Públicas" que, en lo pertinente, instruía:

El Artículo 8.001 de la Ley Electoral de Puerto Rico no constituye, pues, una prohibición absoluta a la publicación de anuncios y avisos gubernamentales. Interpretado en su justa perspectiva, éste sólo limita los anuncios que claramente van dirigidos a exponer logros, programas, proyectos, realizaciones, proyecciones o planes. Otros anuncios que no tengan como objetivo los antes mencionados no están, por lo tanto, cubiertos por dicha prohibición y consecuentemente pueden ser publicados por las agencias sin estar sujetos a la previa autorización de la Comisión Estatal de Elecciones.

. . . . . . . .

Recabo de cada uno de ustedes la más decidida atención al presente asunto, a *fin de uniformar el procedimiento a seguir en la publicación de información gubernamental legítima.* (Énfasis suplido.) Apéndice 6, pág. 016.

Ese enfoque e interpretación irrazonables y restrictivas del ámbito operacional del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, se agrava y cobra proporciones de crisis de ilegalidad, pues bajo esa dilatada interpretación y endoso oficial la inobservancia de la Ley Electoral de Puerto Rico ha tenido el potencial de extenderse ilimitadamente a todo el andamiaje gubernamental. A tono con la misma, si una comunicación pública no conlleva gastos en la adquisición de tiempo y espacio en medios de difusión *comercial*, no existe prohibición legal a su divulgación. Ello ha sido acogido por

todas las agencias gubernamentales, incluso la influyente
Oficina de Comunicaciones de la Oficina del Gobernador. Así
se desprende de la comparecencia de esa oficina a la Comi-
sión Estatal de Elecciones el 30 de abril de 1988, esto es,
mucho antes de la opinión del Secretario de Justicia de 27 de
junio. Allí se sostiene que el Boletín de la Gobernación deno-
minado "Conversando con el Pueblo", está exento de la
prohibición legal, pues "constituye un programa *regular* de
gobierno que se realiza como parte de las funciones de dicha
Oficina [de Comunicaciones de la Oficina del Gobernador],
sobre una base *permanente*, razón por la cual no se puede
considerar como un 'anuncio para fines de campaña polí-
tica'". (Énfasis suplido.) Apéndice 5, pág. 013. Se intenta exi-
mir del mandato de ley dicho boletín al aducir que "es una
publicación de circulación *limitada y de carácter objetivo*".
(Énfasis suplido.) Íd, pág. 014. Se dice que "[s]e publica pe-
riódicamente y en él se incluye *información de incuestiona-
ble interés público*. Por ser una publicación de naturaleza
*oficial*, queda excluida cualquier consideración de tipo co-
mercial". (Énfasis suplido.) Íd. Para ello, se dice que medios
de difusión "evidentemente se refiere a medios de difusión
*comerciales*, pues son éstos y no otros los que admiten 'com-
pra de tiempo y espacio' para divulgación pública". (Énfasis
en el original.) Íd., pág. 013. Y por último se argumenta:
"Más importante aún, la Oficina de Comunicaciones de la
Oficina del Gobernador *no incurre en gastos para la compra
de tiempo y espacio en los medios de difusión pública* al
preparar y circular dicho Boletín de la Gobernación, pues
como se ha señalado anteriormente, dicha publicación la pre-
para la propia Oficina de Comunicaciones y no representa
bajo ningún concepto compra de tiempo y espacio en los me-
dios de difusión comerciales." (Énfasis en el original.) Íd.,
pág. 014.

De difícil juridicidad es ese razonamiento que, en esencia,
anticipa y coincide con la opinión subsiguiente del Secretario
de Justicia. El que una publicación se haya venido realizando

*antes* del período de veda del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, y esté sufragada regularmente, ¿desvirtúa su carácter de anuncio?; ¿pierde su calidad de gastos con fondos públicos que al Boletín de la Gobernación se le caracterice de "naturaleza oficial y continua"?; ¿establece, honestamente, alguna diferencia que lo prepare la propia Oficina de Comunicaciones y no una agencia de publicidad privada? En su origen, ¿de dónde provienen tales fondos? Estas interrogantes quedan contestadas al confrontarnos con la innegable realidad de que es la sustancia y no la apariencia lo crucial y determinante; esto es, que la fuente verdadera son los fondos provenientes del erario público.

En todo esto hay un eufemismo impermisible. Nada hay en la Constitución, en la Ley Electoral de Puerto Rico y en su historial en qué apoyar semejante proposición. Todo lo contrario —sin límite de tiempo— con referencia a toda propiedad mueble e inmueble gubernamental, por interacción recíproca, los Arts. 3.011 y 3.012 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. secs. 3108c y 3108d, respectivamente, proscriben su uso "a los fines de hacer campaña política a favor o en contra de cualquier partido político o candidato", y la concesión a tales efectos de cualesquiera privilegios especiales. De manera expresa, el Art. 3.012 de la Ley Electoral de Puerto Rico, *supra*, consagra el principio constitucional igualitario de que "[t]odos los partidos políticos y candidatos y grupos independientes tendrán el mismo acceso y oportunidad[es] . . .".

En resumen, el uso de fondos públicos para fines de propaganda partidista está prohibido, aun cuando el Gobierno prescinda de los medios de difusión comercial pública del país o de agencias de publicidad privadas.(4) La interpreta-

---

(4) De prevalecer esta contención, podría llegarse al absurdo de que concertadamente todas las agencias establecieran antes del año de elecciones, a través

ción oficial endosada por el Secretario de Justicia, la Secretaria de Estado y la Oficina de Comunicaciones de la Oficina del Gobernador no puede prevalecer, pues atenta contra el texto y subvierte el espíritu del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, y de la Constitución. En el crisol prístino legislativo su alcance fue concebido diáfanamente:

> Finalmente, se proh[í]be a las agencias gubernamentales anunciarse. Se les limita a publicar solamente aquello requerido por ley durante el año de elecciones, y solamente en caso de emergencia, se podrá publicar otro tipo de anuncio, *pero sólo con permiso del Tribunal Electoral.* . . . Se proh[í]be además, que el gobierno use fondos públicos a través de sus agencias para hacer campaña política, efectivo el primero de enero en el año de elecciones. *Todas estas disposiciones tienden a liberar a los partidos de la influencia indeseable de los grandes intereses económicos.* (Énfasis suplido.) Diario de Sesiones de la Asamblea Legislativa 154, 188 (1974).

"Gobernar no es *mandar*, es dirigir sobre las bases jurídicas que el Estado reconoce como sostén de sus instituciones políticas." (Énfasis en el original.) J.C. Luqui, *El Orden Jurídico-Político y los Abogados*, 1985-E Rev. Jur. Arg. La Ley 751, 754 (1985). Así comprendido, en el orden lógico de las cosas y a la luz del esquema estatutario reseñado, correspondía al demandado Departamento de Transportación y Obras Públicas acatar la Ley Electoral de Puerto Rico e ir primero a la Comisión Estatal de Elecciones con el fin de obtener la aprobación correspondiente. La sentencia del tribunal de instancia invierte el mandato legal. Paradójicamente, fue dicho departamento quien incurrió en una preterición del adecuado cauce legal y asumió dúctiles posiciones fluctuantes. En estas circunstancias no debemos

---

· de sus propias oficinas de comunicaciones, un programa de publicación regular y directa —bajo el manto de información de incuestionable interés público— y así continuar haciendo lo que frontalmente la Constitución y la Ley Electoral de Puerto Rico prohíben.

ni podemos procesalmente penalizar al peticionario P.N.P. por haber tocado, *sin más rodeos*, las puertas del Poder Judicial en una situación donde, según indicado, la infracción legal era evidente, el daño constitucional estimablemente continuo, inminente, sustancial e irreparable, y el trámite administrativo lentamente incierto y avasallador. Hacerlo constituiría simplemente una injusticia.

Aun aceptando —para efectos del análisis— la procedencia de la doctrina invocada, en "el balance de conveniencias . . . [se] justifi[caba] una desviación" de la norma que aconseja la autolimitación judicial en estos casos. *Rivera v. E.L.A.*, 121 D.P.R. 582, 596 (1988). "La idea de equilibrio, de equiparación situacional o, si se prefiere, de equivalencia de posibilidades de acción humana constituye una base indesplazable para la configuración de la noción de Justicia." J.C. Smith, *Fundamentos de la relatividad de la justicia*, 1983-B Rev. Jur. Arg. La Ley 1010 (1983). Cualquier renuencia de este Tribunal a intervenir y a adjudicar cabal y expeditamente el recurso, tornaría en ilusoria toda la "lógica y justicia de esta medida correctiva [que] radica en . . . la premisa [de] . . . que un anuncio no autorizado representa una propaganda político-partidista en favor del partido político . . .". *P.P.D. v. Junta Revisora Electoral*, supra, pág. 472. "[E]l instinto jurídico es siempre una guía rectora subconsciente, que va cumpliendo con su irremisible función de legalidad . . . ." *Janer Vilá v. Tribunal Superior*, 90 D.P.R. 281, 302 (1964).

## VII

El derecho es vivo y toma cuerpo de la dinámica del entretejido social. Tomamos conocimiento judicial de que recientemente, a pocas semanas de las elecciones, diversas agencias han comenzado a publicar anuncios masivos —a título de información de interés general— de ostensible tamaño y mensaje elaborado. El incremento en anuncios es

notable y coincide con la plena campaña partidista. En su moción de reconsideración, el P.N.P. nos dice que "[l]a firma que prepara los mismos para el gobierno, es la misma que llevó a cabo la campaña política del Partido Popular Democrático en el 1984, hoy partido de gobierno, Badillo Compton, hoy Badillo, Saatchi y Saatchi Advertising". Moción de reconsideración, pág. 2. Indica lo siguiente:

> No es hasta este momento que el gobierno decide llevar a cabo, en forma masiva, una campaña de orientación o educación general sobre asuntos tales como la limpieza, la basura, la nueva flota de las navieras de Puerto Rico y otros.
>
> . . . El contenido de los anuncios es claramente publicitario en favor de las agencias del Estado Libre Asociado. El mensaje de los mismos crea en la mente del elector o lector, una impresión de un gobierno preocupado por el pueblo y en marcha hacia la solución de los problemas públicos. Los anuncios referidos aunque en forma indirecta, sutil, disimulada o sofisticada, claramente van dirigidos a presentar los logros del gobierno actual, y entre sus logros la propia realización de una campaña pública de orientación ciudadana". Moción de reconsideración, pág. 2.

Y continúa exponiéndonos:

> El anuncio de "Pítale a la Basura" contiene el siguiente mensaje:
>
>> "Hay gente que les importa un pito ensuciar a Puerto Rico. Si ya est[á]s cansado de que se salgan con la suya, ahora puedes hacer algo - ¡Pítales! *Para que sepan que a la mayoría de nosotros sí nos importa la limpieza de Puerto Rico, consigue tu pito y ¡pítale a la basura!*
>>
>> *PITALE A LA BASURA, BRIGADAS DE EMBELLECIMIENTO Y ORNATO TOP*". (Subrayado Nuestro)
>
> El mensaje del anuncio antes indicado claramente lleva al lector o elector, la idea de que se ha creado por el gobierno actual, que es "la mayoría", unas brigadas de embellecimiento y ornato en el Departamento de Transportación y Obras Públicas (TOP), que sí les importa la limpieza de Puerto Rico. Claramente el mensaje es de logros del gobierno y a su vez expone el programa del mismo encaminado al ornato, al embe-

llecimiento y limpieza. Cabe inclusive preguntarnos, si el mensaje de un gobierno que se preocupa por la limpieza, y que quiere terminar con la basura, no transmite además sicológicamente, la idea al lector de que se trata no sólo de limpieza física sino de un gobierno limpio, y una sociedad libre de basura o corrupción.

. . . Los anuncios de las Navieras de Puerto Rico, merecen especial reconocimiento. Se asemejan a los de las líneas áreas. [sic] internacionales y llevan el siguiente mensaje "Aquí está la *nueva flota* de Navieras en nuestro Puerto de San Juan." No se necesita un análisis demasiado profundo para percatarse de que el mensaje transmite la idea de que el gobierno actual o la actual administración ha tra[í]do una *nueva flota*, y por lo tanto el mismo merece patrocinio. En adición el mensaje indica claramente que las Navieras de Puerto Rico *se proponen continuar "Adelante a toda máquina".* Lo anterior es una expresión del programa u objetivos de dicha empresa.

. . . Lo más significativo de todo este asunto es que en dicha gestión, a menos de ochenta días de las Elecciones Generales, parecen estar muy ocupados, la Secretaria de Estado, el Secretario de Justicia, el Secretario de Transportación y Obras Públicas y todos los Secretarios de Departamentos y Jefes de Agencias del Estado Libre Asociado de Puerto Rico (E.L.A.). En otras palabras que se trata aparentemente de toda una acción coordinada y orquestada desde el propio Departamento de Estado, en el objetivo de anunciar al gobierno, sus logros, sus programas y su preocupación por el Pueblo, todo ello, enfatizamos, a menos de ochenta días de las Elecciones Generales de 1988. (Énfasis en el original.) Moción de reconsideración, págs. 2–3.

## VIII

No nos corresponde en esta etapa pronunciarnos respecto a estos planteamientos y su corrección. Conforme nuestro mandato, la Comisión Estatal de Elecciones deberá evaluarlos y resolverlos en sus méritos. Sin prejuzgarlos, merecen las siguientes reflexiones preliminares. En el descargo de su encomienda, dicho organismo tendrá presente que la premisa mayor en la que descansa la prohibición del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, y

animó a la Asamblea Legislativa es la naturaleza voluble de la opinión pública que, si bien difícil de predecir, es sugestionable. Su texto original fue una reacción a una época en que masivamente hubo intentos gubernamentales en año de elecciones para manipular el pensamiento de los electores en beneficio de los incumbentes, al utilizar los fondos públicos provenientes de todos los ciudadanos y electores del país.

El estatuto admite esa realidad viva y la fuerza creciente en la formación y manipulación de la opinión pública por los llamados medios de comunicación social: prensa, radio, televisión, etc. Véanse: W. Overbeck y R.D. Pullen, *Mayor Principles of Media Law*, 2da ed., Nueva York, Ed. Holt, Rinehart y Winston, 1985; D.E. Casper, *Media and the Formation of Public Opinion: A Checklist, 1975–1984*, Illinois, Vance Bibliographies, 1985; D.A. Graber, *Mass Media and American Politics*, 2da ed., Washington D.C., Ed. Congressional Quarterly, 1984. "Como bien ha señalado Alf Ross, la propaganda apunta directamente a los instintos, estando probado que la sugestión emotiva, obedeciendo a normas de psicología colectiva, es mucho más eficaz que las apelaciones subjetivas a la razón ([*op. cit.*], p[ág]. 32). Por efecto de la propaganda, se puede cambiar la expresión de una voluntad popular 'verdadera' por otra voluntad popular 'sintética' ([í]dem, p[ág]. 32), y frente a este riesgo, que es de tanta peligrosidad para la democracia, estima Ross que la mejor salvaguardia está en 'inmunizar a la población contra la propaganda, es decir, desarrollar en ella un sentido crítico que constituya la mejor inmunización contra la infección espiritual inducida por la sugestión propagandista' ([í]dem, p[ág]. 32)." Vanossi, *supra*, págs. 1287–1288.

Las agencias de publicidad cuentan con expertos conocedores de la conducta humana. Ideas, imágenes, detalles visuales y gráficos aparentemente insignificantes pueden esconder solapadamente un mensaje político. Por lo tanto, no

podemos abstraernos de los adelantos de la industria de las comunicaciones y del desarrollo de complejas técnicas para encubrir mensajes. Así, podría sustituir la burda y repudiada práctica de la compra del voto por una refinada fórmula que penetra el inconsciente del elector. De esta manera, un ingenioso anuncio radial o televisivo puede ser una fina argucia para encubrir un mensaje político-partidista. La Comisión Estatal de Elecciones y los tribunales tienen que estar vigilantes a lo que podrían ser novedosas formas de infringir la Ley Electoral de Puerto Rico.(5)

A modo de epílogo, reproducimos el siguiente pensamiento: "Todo el que se dice defensor de la Constitución o de una forma de gobierno y hace lo que es incompatible con ella, a nadie convence; mas despierta recelo y prevención. Por el contrario, el que señala las desviaciones y fallas en la práctica de las instituciones, y lo mismo en la concepción doctrinaria, pero ajusta su conducta a los preceptos que quiere ver respetados y afianzados, es innegable que presta un gran servicio a la causa que defiende. . . . Del Preliminar de *Reflexiones sobre Sistemas Políticos*, *Bielsa*, Universidad Nacional del Litoral, Santa Fe, 1941." Citado en Luqui, *supra*, pág. 751.

—O—

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López, a la cual se une el Juez Asociado Señor Ortiz.

A la luz de la información adicional que nos ha brindado la parte demandante recurrente en el escrito de reconsidera-

_____

(5) Tomamos conocimiento judicial de que las encuestas señalan que el recogido y la disposición de la basura es uno de los problemas que más preocupa a los habitantes de San Juan. Además, secularmente éste ha sido tema de campaña política. En esta sintonía, debe actuar prudente y cautelarmente la Comisión Estatal de Elecciones al decidir los señalamientos del P.N.P.

ción que radicara en el presente caso, información que curiosamente es corroborada por los documentos que acompaña como anejos el Procurador General de Puerto Rico en su comparecencia ante este Tribunal de fecha 12 de septiembre de 1988, estamos contestes en que resulta imperativo que reconsideremos la resolución que tuviéramos a bien emitir el día 18 de agosto de 1988.[1]

Mediante la referida resolución nos negamos a expedir el deficiente recurso de revisión que radicara el Partido Nuevo Progresista en relación con una sentencia emitida por el Tribunal Superior de Puerto Rico, Sala de San Juan,[2] que declaró sin lugar de plano una demanda que radicara el partido político recurrente en solicitud de sentencia declaratoria, entredicho provisional e *injunction* preliminar y permanente en relación con una campaña publicitaria —conocida como "Pítale a la Basura"— que actualmente lleva a cabo el demandado Departamento de Transportación y Obras Públicas de Puerto Rico; campaña publicitaria que se comenzara por el Secretario del referido departamento sin la autorización de la Comisión Estatal de Elecciones.

Conforme la información brindada por las partes en etapa de reconsideración, es evidente que la campaña conocida como "Pítale a la Basura" —la cual, de primera instancia, aparentaba ser una relativamente inocua, efímera y única— resulta ser parte de una coordinada campaña masiva de publicidad del actual partido de gobierno, la cual se lleva a cabo por distintas agencias del mismo sin la autorización de la Comisión Estatal de Elecciones. Dicho sorprendente curso de acción gubernamental está predicado en una desa-

---

[1] Mediante la citada resolución, una sala especial de verano —compuesta la misma por el Juez Presidente Señor Pons Núñez, el Juez Asociado Señor Alonso Alonso y el Juez Asociado suscribiente— proveyó no ha lugar al recurso de revisión radicado.

[2] Hon. Pedro López Oliver, Juez.

fortunada y errónea "opinión" que emitiera el Secretario de Justicia de Puerto Rico[3] en torno a la prohibición contenida en el Art. 8.001 de la ·Ley Núm. 4 de 20 de diciembre de 1977[4] —Ley Electoral de Puerto Rico— referente a los gastos de difusión pública del Gobierno de Puerto Rico durante los años en que se celebran elecciones generales en nuestro país. Dicha situación ciertamente amerita la pronta, decidida· y efectiva intervención de este Tribunal.

Aun cuando, lamentablemente, sea únicamente en nuestro carácter individual, en el descargo de nuestra responsabilidad procedemos a intentar orientar a la profesión y a la ciudadanía en general sobre la materia en controversia con la esperanza de que ello evite en el futuro una multiplicidad de litigios en los cuales se cuestione la procedencia de cada uno de los anuncios que en el futuro difundan las distintas agencias del Gobierno de Puerto Rico, ello ante la penosa ausencia de una norma rectora con carácter de precedente.

## I

El Secretario del Departamento de Transportación y Obras Públicas comenzó una campaña publicitaria en los medios de comunicación del país, comúnmente conocida como "Pítale a la Basura", sin que se hubiera solicitado ni obtenido autorización para ello de la Comisión Estatal de Elecciones.

Con fecha 19 de julio de 1988, y específicamente en relación con la mencionada campaña publicitaria, el Partido Nuevo Progresista radicó ante el Tribunal Superior de Puerto Rico, Sala de San Juan, una *demanda jurada* sobre sentencia declaratoria, entredicho provisional, interdicto preliminar e *injunction* permanente, en la cual alegó, en síntesis y en lo pertinente, que dicha campaña no había sido

---

[3] Opinión emitida conforme con las disposiciones del Art. 63 del Código Político de Puerto Rico, 3 L.P.R.A. sec. 71.

[4] 16 L.P.R.A. sec. 3351.

autorizada por la Comisión Estatal de Elecciones según lo exige el citado Art. 8.001 de la Ley Electoral de Puerto Rico; que el Sr. Francisco González, quien es el actual Comisionado Electoral de dicho partido ante la referida comisión, "se ha opuesto y se opone a las prácticas ilegales que motivan" el recurso radicado,[5] y que:

> . . . de mantener la publicación en prensa, radio y televisión de los anuncios a que hemos hecho referencia sin la previa autorización de la Comisión Estatal de Elecciones, se estaría causando un daño irreparable al Partido Nuevo Progresista, al no estar éste en igualdad de condiciones en cuanto a publicidad se refiere conforme a la intención del legislador, al aprobar las disposiciones legales antes mencionadas.[6]

Conforme a las antes reseñadas alegaciones, el partido político demandante solicitó del tribunal de instancia:

> En mérito de lo cual se solicita muy respetuosamente del Honorable Tribunal que dicte un entredicho provisional contra los demandados para que cesen y desistan so pena de desacato del uso de fondos públicos en la publicación de anuncios en los medios de difusión pública sin la autorización de la Comisión Estatal de Elecciones, ordene si así el Honorable Tribunal lo entendiese pertinente la celebración de una vista y expida un interdicto preliminar, bajo similares términos de entredicho provisional, mientras se diluciden en su totalidad las controversias de autos y declare con lugar la demanda de epígrafe, emitiendo un interdicto permanente prohibiéndose el uso de fondos públicos para la publicación de cualquier anuncio en prensa, radio o televisión sin el previo consentimiento de la Comisión Estatal de Elecciones con cualquier otro procedimiento que en derecho proceda. *Exhibit* IV, pág. 9.

Al día siguiente de haber sido radicado el antes mencionado recurso legal —esto es, el 20 de julio de 1988— el tribu-

---

[5] *Exhibit* IV, pág. 6.
[6] Íd., pág. 8.

nal de instancia emitió una sentencia mediante la cual declaró sin lugar "la solicitud para que se expida [el] auto de [injunction]". *Exhibit* I, pág. 1. En apoyo de dicha determinación, el referido foro expresó, en síntesis y en lo pertinente, que no tenía duda de "que el esquema establecido por la Ley Electoral y el Reglamento de referencia [sobre gastos de difusión pública del Gobierno], requiere que el organismo espec[i]alizado en materia electoral, que es la Comisión Estatal de Elecciones determine, en primera instancia la necesidad de la autorización para la difusión de un anuncio, *así como si dicha ley y reglamento han sido violados*" (énfasis suplido), íd., págs. 1–2; por lo que resultaba "evidente" que el partido político demandante venía en la obligación de acudir ante la Comisión Estatal de Elecciones antes de solicitar la intervención del foro judicial. Expresó, por último, el tribunal de instancia que el demandante no quedaba huérfano de remedios judiciales por cuanto "la intervención judicial queda garantizada a través de la Revisión de la decisión de la Comisión, según dicha Revisión es permitida por el Artículo 1.016 de la Ley Electoral de Puerto Rico . . .". Íd., pág. 2.

Inconforme, la parte demandante acudió ante este Tribunal mediante la radicación de un recurso de revisión, en el cual discutió en forma sumamente general su único señalamiento de error, a saber:

"ERRÓ EL HONORABLE TRIBUNAL SENTENCIADOR AL DECLARAR SIN LUGAR LA SOLICITUD PARA QUE SE EXPIDA AUTO DE INJUNCTION EN EL CASO DE AUTOS[.]" Solicitud de revisión, pág. 2.

Como expresáramos anteriormente, una sala especial de verano denegó la revisión solicitada mediante resolución de fecha 18 de agosto de 1988. La parte demandante recurrente solicitó reconsideración. En el escrito que radicara a esos efectos nos señaló —*por primera vez*— que a su juicio la campaña publicitaria conocida como "Pítale a la Basura" — al igual que otros anuncios que estaban siendo publicados por diferentes agencias del Gobierno de Puerto Rico— tenía

su génesis en una "opinión" de fecha 27 de junio de 1988 que había emitido el señor Secretario de Justicia a solicitud de la señora Secretaria de Estado, Hon. Sila M. Calderón; relativa dicha consulta a si, por razón de ser año de elecciones, el Departamento de Estado venía en la obligación legal de obtener autorización previa de la Comisión Estatal de Elecciones respecto a los anuncios a ser publicados en los medios de comunicación del país, mediante los cuales se proponía invitar a la ciudadanía en general a participar en los actos oficiales de conmemoración de la independencia de Estados Unidos de América y del establecimiento del Estado Libre Asociado de Puerto Rico.

En la referida "opinión",[7] *de la cual tomamos conocimiento judicial,* el Secretario de Justicia expresó, en síntesis y en lo pertinente, que el citado Art. 8.001 de la Ley Electoral de Puerto Rico:

> . . . no constituye una prohibición absoluta a la publicación de anuncios y avisos gubernamentales. Interpretado en su justa perspectiva, éste sólo limita los anuncios que claramente van dirigidos a exponer logros, programas, proyectos, realizaciones, proyecciones o planes. Otros anuncios que no tengan como objetivo los antes mencionados no están, por lo tanto, cubiertos por dicha prohibición *y consecuentemente pueden ser publicados por las agencias concernidas sin necesidad de obtener la autorización de la comisión Estatal de Elecciones.* (Énfasis suplido.) Apéndice 7, pág. 019.

Ante esta situación, el tribunal consideró apropiado y procedente concederle término al Procurador General de

---

[7] La mencionada comunicación fue firmada por el Lcdo. Guillermo Mojica Maldonado, Subsecretario del referido departamento, en su carácter de Secretario de Justicia Interino. Resulta necesario señalar, sin embargo, que el Secretario de Justicia en propiedad, Lcdo. Héctor Rivera Cruz, ratificó dicha posición mediante carta de fecha 15 de agosto de 1988 que le dirigiera al Presidente de la Comisión Estatal de Elecciones. Por lo tanto, la comunicación de 27 de junio de 1988 constituye, a todos los efectos legales, la posición oficial sobre este asunto del Secretario del Departamento de Justicia y de la actual administración de gobierno.

Puerto Rico, como representante legal del recurrido Departamento de Transportación y Obras Públicas, para que expresara su posición respecto a la procedencia del *injunction* en vista de que la campaña publicitaria en controversia no contaba con la autorización previa de la Comisión Estatal de Elecciones; el aspecto de la jurisdicción del tribunal de instancia, y el porqué no debíamos expedir el auto y dictar sentencia ordenando la paralización del anuncio en cuestión hasta tanto la referida comisión pasara juicio sobre la procedencia en sí del mismo. Dicho funcionario compareció mediante escrito de fecha 12 de septiembre de 1988.

## II

El citado Art. 8.001 de la vigente Ley Electoral de Puerto Rico establece que:

> Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.
>
> Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones. 16 L.P.R.A. sec. 3351.

La transcrita disposición legal no presenta problema alguno de interpretación. La misma está concebida en términos claros y diáfanos. Una somera lectura de los mismos es todo lo que se necesita para entender su mandato. Dicho artículo de ley contempla tres situaciones. En primer lugar, establece una *prohibición absoluta* durante año de elec-

ciones generales,(8) la cual le es aplicable a las tres ramas de gobierno, respecto a la publicación en cualesquiera de los medios de difusión pública existentes en nuestro país de cualquier tipo de anuncio *mediante los cuales se pretenda exponer los programas, proyectos, logros, realizaciones, proyecciones o planes de dichas tres ramas de gobierno.*

El referido Art. 8.001 de la Ley Electoral de Puerto Rico permite, sin embargo, la publicación o difusión en año de elecciones de anuncios que tienen el propósito u objetivo de difundir "información de interés público, urgencia o emergencia . . .". Ello siempre y cuando que los mismos hayan sido *previamente autorizados* por la Comisión Estatal de Elecciones. Esto es, la ley le concede —de manera expresa y con carácter de exclusividad en primera instancia— a la Comisión Estatal de Elecciones la facultad para decidir si un anuncio en particular puede ser difundido por constituir o versar el mismo sobre un asunto de interés público, urgencia o emergencia.(9) A esos fines, la referida comisión ha establecido, en el reglamento que promulgara sobre los gastos de difusión pública del Gobierno, un procedimiento mediante el cual la rama de gobierno que pretende publicar un anuncio de esta naturaleza, pueda acudir ante la misma en solicitud de dicho permiso.(10)

---

(8) La mencionada prohibición estará en vigor desde el día 1ro de enero del año en que se celebren las elecciones generales hasta el día después de la celebración de las mismas.

(9) La decisión que a esos efectos emita la Comisión Estatal de Elecciones es, naturalmente, revisable ante los tribunales.

(10) En cuanto al anuncio sobre información de interés público, véanse en específico las Secs. 2.1 a 2.4 del Reglamento de Gastos de Difusión Pública del Gobierno (Reglamento de Gastos) de 11 de diciembre de 1987, págs. 4–6.

En relación con los anuncios sobre difusión de información de urgencia o emergencia, véanse las Secs. 3.1 a 3.4 de dicho reglamento. Reglamento de Gastos, *supra*, págs. 6–7. En cuanto a estos últimos, el reglamento contempla la posibilidad del anuncio de urgencia o emergencia que razonablemente pueda ser previsto, en cuyo caso se requiere autorización previa de la comisión, y aquellos

En tercer lugar tenemos que, por disposición expresa a esos efectos, la prohibición contenida en el citado Art. 8.001 de la Ley Electoral de Puerto Rico no alcanza a los avisos y anuncios de prensa —tales como edictos, convocatorias a exámenes y reválidas, etc.— que son "expresamente requeridos por ley". En relación con dichos avisos y anuncios, merece que se enfatice el hecho de que las distintas agencias gubernamentales que vienen en la obligación legal de publicar los mismos están exentas de solicitar permiso ante la Comisión Estatal de Elecciones. Esto es —contrario a la situación de los anuncios sobre información de interés público, urgencia o emergencia— que en esta situación no se requiere autorización de clase alguna por parte de la referida comisión.[11]

En resumen, y en palabras sumamente sencillas, en año de elecciones generales —del 1ro de enero de ese año hasta el día siguiente de la celebración de las mismas— *todo* anuncio que provenga de cualquiera de las tres ramas del Gobierno, que no sea un aviso de los expresamente requeridos por alguna ley, *tiene que ser autorizado* por la Comisión Estatal de Elecciones *antes* de que el mismo pueda ser difundido en alguno de los medios de comunicación del país.[12]

De lo expuesto, resulta evidente la incorrección de la posición asumida por el Secretario de Justicia en su "carta opi-

---

que no puedan serlo, en cuya situación se puede difundir el anuncio, viniendo obligada la agencia a radicar ante la Comisión Estatal de Elecciones "una justificación sobre la publicación" realizada dentro de las cuarenta y ocho horas de haberse publicado el mismo.

[11] La Sec. 4.1(B) del Reglamento de Gastos promulgado por la Comisión Estatal de Elecciones exige, en relación con esta clase de avisos, de las agencias que radiquen ante la comisión, no más tarde del 31 de diciembre anterior al año de elecciones, una *certificación* conteniendo una relación de *todos* los anuncios de prensa que le son expresamente requeridos por ley.

[12] Con la excepción, como señaláramos anteriormente, del anuncio de emergencia, el cual podrá ser difundido siempre y cuando que se someta una justificación para ello ante la Comisión Estatal de Elecciones dentro de las cuarenta y ocho horas de haber sido difundido el mismo.

nión" de fecha 27 de junio de 1988, ratificada la misma por el Procurador General en su comparecencia ante este Tribunal de fecha 12 de septiembre de 1988. Conforme el criterio sustentado por dichos funcionarios gubernamentales, serían los propios funcionarios ejecutivos de las tres ramas de gobierno los que tendrían la facultad y el poder decisional para determinar qué anuncios o avisos pueden ser publicados por no tener los mismos el objetivo de exponer logros, programas, proyectos, etc.

Dicha interpretación es clara y palpablemente errónea. Ello fue lo que precisamente tuvo por objetivo evitar el legislador cuando originalmente aprobó las disposiciones del citado Art. 8.001 de la vigente Ley Electoral de Puerto Rico. Dicha disposición legal tuvo, y tiene, el propósito loable de evitar el derroche de fondos públicos por parte, precisamente, de funcionarios que, cegados por el deseo de permanecer en el poder, malgastan el dinero del pueblo en exageradas e innecesarias campañas publicitarias. El legislador entendió que dicho propósito se lograba poniendo en manos de la Comisión Estatal de Elecciones, en primera instancia, la delicada función de decidir qué anuncios podían o no ser publicados legítimamente por el Gobierno en años de elecciones generales. La interpretación del Secretario de Justicia resulta, cuando menos, sorprendente por cuanto constituye un menosprecio a la letra clara, y libre de toda ambigüedad, del citado Art. 8.001. Véase el Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14. La misma tiene el efecto de hacer inoperante, de un plumazo, las disposiciones de la mencionada disposición legal.

## III

Las circunstancias particulares del caso hacen necesario que nos enfrentemos, y contestemos, la interrogante de cuál

doctrina —entre la de "jurisdicción primaria", la de "jurisdicción primaria exclusiva" o la de "agotamiento de remedios administrativos"— es la aplicable al mismo. Dicha interrogante requiere que hagamos una breve síntesis de cada una de las referidas doctrinas.

En *E.L.A. v. 12,974.78 Metros Cuadrados*, 90 D.P.R. 506, 511 (1964), expresamos, en referencia a la doctrina de jurisdicción primaria, que la misma "opera para determinar qué organismo, si el judicial o el administrativo, debe hacer la determinación inicial del asunto y se aplica específicamente cuando la situación presenta cuestiones de hecho que requieren el ejercicio de la discreción administrativa . . .". Esto es, bajo esta doctrina se reconoce la existencia de *jurisdicción concurrente* entre el foro administrativo y el foro judicial; ello no obstante, este último se abstiene de ejercer su jurisdicción permitiendo a la agencia o foro administrativo ejercer primariamente la suya por ser del criterio que es el foro administrativo el más apropiado para entender en el asunto en controversia. Esta determinación de cuál es el foro más apropiado ha de hacerse tomando en cuenta si el asunto en controversia requiere para su solución ciertas destrezas o conocimientos especializados (*expertise*) y si la agencia en cuestión tiene o no dichas destrezas y conocimientos. De determinar que el asunto en controversia requiere un conocimiento especializado para su más adecuada solución, y que la agencia posee ese conocimiento y destrezas, el tribunal opta por no ejercer su jurisdicción. Véanse, en adición: *Delgado Rodríguez v. Nazario de Ferrer*, 121 D.P.R. 347 (1988); *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716 (1982); *Lomas de Carolina Corp. v. Tribunal Superior*, 101 D.P.R. 574 (1973).[13]

---

[13] En *Delgado Rodríguez v. Nazario de Ferrer*, 121 D.P.R. 347, 354 (1988), al reafirmar la norma expuesta en *E.L.A. v. 12,974.78 Metros Cuadrados*, 90 D.P.R. 506 (1964), expresamos:

Esta doctrina se diferencia sustancialmente de la doctrina de jurisdicción primaria exclusiva, doctrina reconocida por este Tribunal en los casos de *Ferrer Rodríguez v. Figueroa*, 109 D.P.R. 398, 401 (1980), y *First Fed. Savs. v. Asoc. de Condómines*, 114 D.P.R. 426, 434 (1983). La diferencia entre ambas estriba en que, bajo la doctrina de jurisdicción primaria, ambos foros poseen jurisdicción y sólo es menester determinar qué foro es el más apropiado para entender en el asunto, mientras que, bajo la doctrina de jurisdicción primaria exclusiva, se le confiere por ley a la agencia o foro administrativo jurisdicción exclusiva para entender primariamente en el asunto en controversia. Esto es, sólo la agencia puede resolver en primera instancia el asunto en controversia, privándose a los tribunales de intervenir inicialmente en el mismo. *Ferrer Rodríguez v. Figueroa*, supra.

La doctrina sobre agotamiento de remedios administrativos, por su parte, sirve el propósito de determinar en qué etapa del procedimiento pendiente ante la agencia puede el litigante recurrir a los tribunales. *Delgado Rodríguez v. Nazario de Ferrer*, supra; *E.L.A. v. 12,974.78 Metros Cuadrados*, supra. Así, en *Vélez Ramírez v. Romero Barceló*, supra, pág. 722, expusimos en torno a esta doctrina, lo siguiente:

> En cambio, la [doctrina] de agotamiento se dirige a dilucidar *cuándo* es el momento apropiado para que los tribunales intervengan en una controversia *previamente sometida* a una intervención administrativa. Por tanto, el examinar su posible

---

"En su origen, la doctrina de *jurisdicción primaria* —de génesis jurisprudencial— fue concebida para guiar a los tribunales a determinar si deben intervenir inicialmente en cierta controversia o si le permiten a la agencia concernida resolverla según las funciones y prerrogativas contenidas en su ley orgánica. Entra en juego cuando existe jurisdicción concurrente. Versa sobre 'prioridad de jurisdicción'. . . . A su amparo, el foro judicial se abstiene para permitir al organismo enjuiciar una materia de su competencia, bajo el supuesto de que éste posee unas destrezas y conocimientos especializados (*expertise*)." (Citas y escolio omitidos y énfasis en el original.)

aplicación surge cuando, *habiendo comenzado* un procedimiento o actuación en una agencia, se solicita la intervención judicial para revisar determinaciones u obtener un remedio judicial, *antes* de que se haya culminado todo el trámite o procedimiento administrativo establecido. (Énfasis suplido y en el original.)

A tenor con esta doctrina, los tribunales se abstienen de revisar una actuación de una agencia gubernamental hasta tanto la persona afectada agote todos los remedios administrativos disponibles y la agencia haya emitido una decisión final al efecto. De no agotarse los remedios administrativos, el tribunal carecerá de jurisdicción para entender en el asunto en controversia. *Rivera v. E.L.A.*, 121 D.P.R. 582 (1988); *Delgado Rodríguez v. Nazario de Ferrer*, supra.

Tanto la doctrina de jurisdicción primaria como la de agotamiento de remedios administrativos, son normas de autolimitación judicial y de conveniencia práctica cuyo objetivo es mantener un adecuado balance y distribución de poder y tareas entre las agencias administrativas y el poder judicial, asegurar una mayor eficacia y rapidez en los procesos administrativos y evitar una intervención judicial "innecesaria y a destiempo". *Delgado Rodríguez v. Nazario de Ferrer*, supra; *Rivera v. E.L.A.*, supra; *Vélez Ramírez v. Romero Barceló*, supra.

Nuestra jurisprudencia ha reconocido varias situaciones de excepción en cuanto a las anteriormente mencionadas doctrinas. Así, bajo la doctrina de jurisdicción primaria se justifica la desviación del cauce administrativo cuando ha habido un agravio de patente intensidad al derecho del individuo que reclama urgente reparación o cuando se han violado derechos fundamentales. *Otero Martínez v. Gobernador*, 106 D.P.R. 552, 556 (1977). En relación con la doctrina de jurisdicción primaria exclusiva hemos resuelto que únicamente se justifica el soslayar el procedimiento administrativo exclusivo provisto por ley en casos que envuelvan un agravio de

patente intensidad al derecho del individuo que reclama urgente reparación, bajo la Ley de Derechos Civiles y aquellos en que se ataca la constitucionalidad de la ley orgánica de la agencia administrativa y, por consiguiente, de sus actuaciones. *First Fed. Savs. v. Asoc. de Condómines*, supra, págs. 437–438.

Ya en cuanto a la doctrina de agotamiento de remedios administrativos, hemos reconocido como excepción: (1) cuando lo presentado es una cuestión de derecho que no requiere el ejercicio de discreción administrativa; (2) cuando el remedio administrativo es inútil e inadecuado; (3) cuando ha habido violación a los derechos civiles; (4) cuando la acción administrativa ha de causar daño inminente material, sustancial y no teórico o especulativo, o (5) cuando la agencia carece de jurisdicción. Véanse: *Rivera v. E.L.A.*, supra; *Delgado Rodríguez v. Nazario de Ferrer*, supra, pág. 355 n. 3; *Vélez Ramírez v. Romero Barceló*, supra; *Srio. del Trabajo v. Ríos*, 99 D.P.R. 538 (1971); *Vda. de Iturregui v. E.L.A.*, 99 D.P.R. 488 (1970).

## IV

De lo expuesto surge que el citado Art. 8.001 de la Ley Electoral de Puerto Rico le concede jurisdicción primaria exclusiva, en primera instancia, a la Comisión Estatal de Elecciones sobre la determinación de qué anuncio, proveniente de cualquiera de las tres ramas de nuestro Gobierno, puede o no ser publicado durante año de elecciones generales.

Ahora bien, habiendo obviado el Departamento de Transportación y Obras Públicas su obligación de acudir a la Comisión Estatal de Elecciones en solicitud de ese permiso, ello en virtud de la interpretación que de la citada disposición legal hiciera el Secretario de Justicia, nos encontramos en una etapa de interpretación estatutaria —función que principalmente compete y en la cual son especialistas los tribu-

nales de justicia, *García Cabán v. U.P.R.*, 120 D.P.R. 167 (1987)— y de proveer remedios como consecuencia de la comisión de una violación de la ley en relación con la cual tienen jurisdicción concurrente tanto la referida comisión como los tribunales de justicia.[14] En otras palabras, estando frente a una situación de jurisdicción primaria, debemos resolver si procede que nos abstengamos de ejercer jurisdicción o si por el contrario existen las circunstancias que ameritan que la ejerzamos.

Como expresáramos en *Marrero v. Mun. de Morovis*, 115 D.P.R. 643, 646 (1984) —caso en que declaramos inconstitucional el Art. 3.017 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3111, en tanto en cuanto el mismo autorizaba el uso irrestricto de los automóviles del Gobierno para fines político-partidistas por, entre otras razones, el mismo crear una ventaja indebida a favor de los oficiales públicos incumbentes y en detrimento de los no incumbentes— al presente

---

[14] En virtud de las disposiciones de las Secs. 5.1 a 5.6 del Reglamento de Gastos, *supra*, promulgado por la Comisión Estatal de Elecciones, ésta —a través de una junta de oficiales examinadores— puede ordenar la citación y comparecencia de partes relativa a la violación de las disposiciones del Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, y emitir la comisión una orden correctiva o remedial al efecto la cual, de no ser cumplida, puede ser puesta en vigor, a petición de la comisión, por los tribunales.

En cuanto a los tribunales, resolvimos en *Otero Martínez v. Gobernador*, 106 D.P.R. 552 (1977), que si bien el recurso de *injunction* —bajo los Arts. 677 y 678 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 3523 y 3524— no desplaza ni sustituye los procedimientos provistos en la esfera administrativa, tampoco está supeditado a normas de jurisdicción primaria y agotamiento de remedios administrativos, por lo cual procede a utilizarse el mismo cuando el procedimiento ordinario no provee un remedio adecuado o eficaz para corregir un agravio de patente intensidad, o cuando es necesaria la pronta reivindicación de derechos fundamentales. *First Fed. Savs. v. Asoc. de Condómines*, 114 D.P.R. 426 (1983); *Pierson Muller I v. Feijoó*, 106 D.P.R. 838 (1978); *Febres v. Feijoó*, 106 D.P.R. 676 (1978).

En *Rivera v. E.L.A.*, 121 D.P.R. 582, 596 (1988), al reafirmar dicha norma, expresamos:

". . . [S]i la reclamación del demandante relata 'un agravio de patente intensidad al derecho del individuo que reclame urgente reparación', se puede utilizar el *injunction* para eludir el cauce administrativo."

"en materia electoral no se cuestiona seriamente el postulado de igualdad inmerso en nuestra Constitución" y que, históricamente, ese ideal "ha cobrado vida en el esquema integral financiero trazado por la Asamblea Legislativa para lograr paridad económica entre los partidos y los candidatos". Es por ello que cualquier actuación o legislación que cree, o tienda a crear, situaciones de inferioridad entre los partidos políticos y los candidatos, puede ser susceptible de impugnación constitucional. *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 638 (1984).

Resulta incuestionable e irrefutable el hecho de que el Departamento de Transportación y Obras Públicas, al publicar sus anuncios sin la previa autorización de la Comisión Estatal de Elecciones, actuó en violación de la Ley Electoral de Puerto Rico. Dicha ley, como expresáramos anteriormente, claramente requiere que todo anuncio —que no sea de los expresamente requeridos por alguna ley— sea sometido ante la Comisión Estatal de Elecciones para su aprobación durante año de elecciones generales. No albergamos duda alguna de que el propósito que animó al legislador al aprobar el citado Art. 8.001 de la Ley Electoral de Puerto Rico fue el de evitar que un partido político, por el mero hecho de estar en el poder y controlar las distintas agencias del Gobierno, gaste fondos públicos en año de elecciones con el objetivo de pregonar sus logros y hazañas. Es norma reiterada por este Tribunal, repetimos, que toda actuación que tienda a crear una indebida desigualdad o desventaja no justificada entre unos partidos políticos y otros, es impermisible constitucionalmente. En su consecuencia, la infracción de las disposiciones del citado Art. 8.001 por parte de la actual administración conlleva la violación de los derechos constitucionales de los restantes partidos políticos en tanto y en cuanto promueve la indebida ventaja de ese partido en el poder sobre los otros.

Nuestra jurisprudencia claramente sostiene esa conclusión. En *P.R.P. v. E.L.A.*, supra, reafirmamos la norma de la igualdad de derechos en el proceso electoral, referente la misma al aspecto de representación, como salvaguarda para evitar la indebida ventaja que puedan obtener los partidos mayoritarios o el partido en el poder frente a los demás partidos minoritarios.

Dada la patente e inminente violación de estos derechos fundamentales, se requiere una solución rápida y eficaz que vindique, con la premura que estos casos requieren, los derechos del demandante. Coexisten dos procedimientos: el de las Secs. 5.1 a 5.6 y 8.1 del mencionado Reglamento de Gastos de Difusión Pública del Gobierno de 11 de diciembre de 1987, págs. 8–10, y el de *injunction* bajo el Art. 678 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3524. Sin embargo, el procedimiento provisto por el reglamento de la comisión no provee un remedio pronto y eficaz para vindicar los derechos fundamentales aquí envueltos.([15]) Al período de

---

([15]) Según surge de las disposiciones del Título V del Reglamento de Gastos, *supra*, Secs. 5.1 a 5.6, el procedimiento que se provee para la evaluación de las solicitudes de autorización de difusión de anuncios —el cual, conforme acuerdo tomado por la comisión de fecha 24 de mayo de 1988, sería aplicable al presente caso— es el siguiente:

Primeramente, una junta de oficiales examinadores designada por la Comisión Estatal de Elecciones evalúa la solicitud de autorización tomando en consideración todo documento o información presentada, y somete un informe a la comisión conteniendo su recomendación. La junta tiene *cinco días* desde la radicación de la solicitud de autorización para presentar dicho informe.

La Comisión Estatal de Elecciones, por su parte, tiene *tres días* desde la presentación del informe para adoptarlo, modificarlo, revocarlo, *devolverlo para nuevo examen* o emitir la decisión que estime procedente. De expirar dicho plazo sin que la comisión actúe sobre el informe, se entenderá que la comisión está conforme con la decisión recomendada en el mismo. En tal caso, la decisión contenida en el informe se considerará para todos los efectos legales como la decisión de la comisión. La comisión tiene un máximo de *cinco días* luego de expirado el referido plazo de tres días para notificar su decisión.

Según se desprende de esto, tenemos que pueden pasar hasta casi dos semanas (13 días) antes de que se emita una decisión y la misma se notifique, ello partiendo de la premisa de que la comisión actúe sobre el informe de la junta de

tiempo que por reglamento le toma a la Comisión Estatal de Elecciones emitir su decisión, hay que sumarle aquel que tomaría poner en vigor la misma, a través del foro judicial, en caso de incumplimiento con dicha decisión. La innecesaria dilación que ello conlleva no se justifica en vista de la clara y crasa violación de la Ley Electoral de Puerto Rico envuelta en el presente caso.

El único remedio rápido y eficaz, en pronta reivindicación de la ley, resulta ser la expedición de un *injunction* bajo la Sec. 3524 del Código de Enjuiciamiento Civil, *supra*, ya que "su naturaleza es la de recurso legal extraordinario a utilizarse cuando el procedimiento ordinario no provea un remedio rápido, adecuado y eficaz, para corrección de un agravio de patente intensidad al derecho del individuo que reclame urgente reparación. Este *injunction* provisto para la pronta vindicación de derechos fundamentales, es recurso privilegiado tan eficaz en su acción como exigente en la claridad y valía del derecho reclamado". *Otero Martínez v. Gobernador*, supra, pág. 556.

No albergamos duda de que resulta procedente la determinación, vía sentencia declaratoria, a los efectos de que *la publicación* de todo anuncio gubernamental —que no sea de los expresamente requeridos por alguna ley— durante año de elecciones generales sin la previa autorización de la Comisión Estatal de Elecciones, es ilegal. Procede, en adición —ante la clara violación de la Ley Electoral de Puerto Rico cometida por la parte demandada y la violación de los derechos constitucionales de los demandantes— la expedición del

---

examinadores ya fuere adoptándolo, modificándolo o revocándolo, o que no actúe de manera alguna sobre él. Si la comisión, luego de evaluarlo, decide *devolverlo* a la junta para ulterior evaluación (gestión que deberá realizar dentro de los tres días siguientes a la fecha en que le fue presentado el mismo) la decisión final de la comisión podría producirse aún más tarde de las dos semanas que hemos señalado como plazo máximo, ya que no surge del reglamento qué término, si alguno, tendrá la junta de examinadores para emitir un nuevo informe.

*injunction* permanente solicitado, por cuanto la acción del remedio extraordinario del *injunction* va "dirigida a evitar un daño inminente *o a restablecer el régimen de ley conculcado por conducta opresiva, ilegal o violenta del transgresor del orden jurídico*". (Énfasis suplido.) *Peña v. Federación de Esgrima de P.R.*, 108 D.P.R. 147, 154 (1978). Véanse, en adición: *Pérez v. Pagán*, 79 D.P.R. 195 (1956); *Colón v. San Patricio Corporation*, 81 D.P.R. 242 (1959).[16]

## V

Por los fundamentos antes expuestos, consideramos procedente que se reconsidere nuestra resolución de fecha 18 de agosto de 1988, se expida el auto de revisión solicitado y se

---

[16] En su comparecencia del día 12 de septiembre de 1988, el Procurador General, en adición a reafirmarse y ratificar la interpretación que del Art 8.001 de la Ley Electoral de Puerto Rico, *supra*, hiciera el Secretario de Justicia, nos llama la atención el hecho de que el tribunal de instancia nunca adquirió jurisdicción sobre los demandados ya que: (a) nunca hicieron las gestiones para notificar la solicitud de entredicho provisional a los demandados según exige la Regla 57.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y (b) ninguno de los demandados fue emplazado ni notificado con copia de dicha solicitud de entredicho y sentencia declaratoria. Concluyen que la notificación del recurso de revisión ante este Tribunal no satisface los requisitos de notificación adecuada, y que con ello se ofenden principios de debido proceso de ley. A pesar de ese llamado, no solicitan que decretemos que el tribunal de instancia no tenía jurisdicción para considerar y desestimar la demanda por falta de jurisdicción sobre sus personas.

Aun cuando para dictar una orden de entredicho provisional hay que cumplir sustancialmente con los requisitos de la Regla 57.2 de Procedimiento Civil, *supra* (*Arrarás v. Tribunal Superior*, 100 D.P.R. 379 (1972)), ello resulta ser inmaterial en el presente caso por cuanto en el mismo no se dictó tal orden. Por el contrario, el Tribunal rechazó de plano la solicitud según autorizado por nuestra jurisprudencia. *El Mun. de Gurabo v. Juncos Central Co.*, 18 D.P.R. 408 (1912).

Además, habiéndose desestimado de plano la demanda, era imposible y totalmente innecesario continuar con los procedimientos en instancia para emplazar a los demandados. La parte recurrente cumplió adecuadamente con nuestro reglamento al notificar su solicitud de revisión y otros escritos a la parte demandada. Por otro lado, se cumplió con el debido proceso de ley al este Tribunal darle la oportunidad a los demandados de ser oídos. En adición, este Tribunal está en posición de resolver sin necesidad de vista evidenciaria a nivel de instancia por no existir controversia de hechos y estar envuelta únicamente una cuestión de derecho. *Torres Ponce v. Jiménez*, 113 D.P.R. 58 (1982).

dicte sentencia revocatoria de la emitida por el tribunal de instancia. Decretaríamos, en adición, que todo anuncio gubernamental, que no sea de los expresamente requeridos por alguna ley, tiene que contar con la autorización previa de la Comisión Estatal de Elecciones antes de poder ser difundido por alguno de los medios de comunicación del país. Consideramos igualmente procedente la expedición de un *injunction* permanente en relación con el anuncio conocido como "Pítale a la Basura" por no contar el mismo con la autorización de la referida Comisión Estatal de Elecciones. Estamos conformes, por último, con que se devuelva el caso al Tribunal Superior de Puerto Rico, Sala de San Juan, con instrucciones para que éste, conservando su jurisdicción, posponga su intervención hasta que la Comisión Estatal de Elecciones, en un plazo no mayor de cinco días, proceda a resolver si dichos anuncios son permisibles a la luz del Art. 8.001 de la Ley Electoral de Puerto Rico vigente, *supra*.