EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Hon. Aníbal Acevedo Vilá<br>Corporación de Puerto Rico<br>para la Difusión  Pública<br>      Recurrido<br><br>        v.<br><br>Comisión Estatal de Elecciones<br>      Peticionaria<br>\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*<br>Hon. Aníbal Acevedo Vilá<br>Corporación de Puerto Rico<br>para la Difusión Pública<br>      Recurridos<br><br>        v.<br><br>Comisión Estatal de Elecciones, Junta<br>Examinadora de Anuncios, et al.<br><br>Tomas Rivera Schatz,<br>Comisionado Electoral del Partido<br>Nuevo Progresista<br>      Peticionario | Certiorari<br><br>2007 TSPR 231<br><br>172 DPR \_\_\_\_ |

Número del Caso:  CC-2006-813
         Cons.  CC-2006-819
               CC-2006-815

Fecha: 27 de diciembre de 2007

Tribunal de Apelaciones:

               Región Judicial de San Juan-Panel III

 Juez Ponente:

               Hon. Migdalia Fraticelli Torres

 Abogados de la Parte Peticionaria:

               Lcdo. Ramón L. Walker Merino
               Lcdo. José A. Carlo Rodríguez
               Lcdo. Gilberto Concepción Suárez
               Lcdo. Pedro E. Ortiz Álvarez

 Oficina del Procurador General:

               Lcda. Sarah Y. Rosado Morales
               Procuradora General Auxiliar

 Materia: Anuncios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Aníbal Acevedo Vilá          *
Corporación de Puerto Rico        *
para la Difusión Pública          *
   Recurrido                      *
                                  *
              v.                  *     CC-2006-813
                                  *     CC-2006-819
Comisión Estatal de Elecciones    *
   Peticionaria                   *
**********************************     Certiorari
Hon. Aníbal Acevedo Vilá;         *
Corporación de Puerto Rico        *
para la Difusión Pública          *
   Recurridos                     *
                                  *
              v.                  *     CC-2006-815
                                  *
Comisión Estatal de Elecciones,   *     **Consolidados**
Junta Examinadora de Anuncios,    *
Juan Dalmau Ramírez, Comisionado  *
Electoral del Partido             *
Independentista Puertorriqueño,   *
y Geraldo A. Cruz Maldonado,      *
Comisionado Electoral del         *
Partido Popular Puertorriqueño    *
   Partes                         *
                                  *
Thomas Rivera Schatz,             *
Comisionado Electoral del         *
Partido Nuevo Progresista         *
   Peticionario                   *
**********************************

Opinión del Tribunal emitida por el Juez Presidente señor
Hernández Denton


San Juan, Puerto Rico, a 27 de diciembre de 2007.

El presente caso nos brinda la oportunidad de pautar por primera vez diversos aspectos de la normativa que regula la difusión de anuncios gubernamentales en periodos de veda electoral. En particular, nos corresponde determinar el alcance de la frase "gastos para la compra de tiempo y espacio en los medios de difusión pública", contenida en el Artículo 8.001 de la

Ley Electoral de Puerto Rico[1], así como lo que configura la "situación extraordinaria" que justifica difundir un anuncio o mensaje sin acogerse previamente al procedimiento de autorización establecido a esos efectos.

## I.

El pasado 23 de septiembre de 2004 la Asamblea Legislativa de Puerto Rico aprobó la "Ley del Referéndum sobre el Sistema Camaral de la Asamblea Legislativa" que proveía para consultar al electorado puertorriqueño su preferencia en cuanto a cambiar la composición de nuestro sistema legislativo de uno bicameral a uno unicameral.[2]

En vista de ello, en febrero de 2005 la Comisión Estatal de Elecciones (en adelante C.E.E.) determinó que a la referida consulta le aplicaría lo dispuesto en el Artículo 8.001 de la Ley Electoral.[3]  A esos fines, la C.E.E. constituyó la Junta Examinadora de Anuncios, la cual estaría compuesta por un Oficial Examinador en representación de cada partido político y por un representante del Presidente de la C.E.E.  La vigencia de la veda electoral se notificó a las tres Ramas del Gobierno y a los Municipios.  La misma se mantendría

---

[1] Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, 16 L.P.R.A. sec. 3351.

[2] Véase, Ley del Referéndum sobre el Sistema Camaral de la Asamblea Legislativa, Ley Núm. 477 de 23 de septiembre de 2004, 16 L.P.R.A. sec. 971 *et seq.*

[3] La C.E.E. fundamentó su decisión en lo resuelto en P.P.D. v. Rosselló González II, 136 D.P.R. 916 (1994).

vigente desde el 1 de marzo de 2005 hasta el 11 de julio del mismo año.

En aras de implantar las disposiciones de la Ley Electoral; regular el procedimiento para solicitar autorización del uso de medios de difusión y facultar a la C.E.E. a investigar si algún anuncio difundido había obtenido previa autorización, la C.E.E. aprobó –antes de que la veda electoral entrara en vigor– el Reglamento para el Control de Gastos de Difusión Pública del Gobierno para el Referéndum de 10 de julio de 2005 (en adelante, el Reglamento).

El 31 de mayo de 2005 la Oficina del Gobernador emitió un Comunicado de Prensa mediante el cual anunció que, al día siguiente, el referido funcionario ofrecería un mensaje especial al pueblo de Puerto Rico que sería transmitido en vivo desde la Fortaleza. Se indicó que éste haría "unas expresiones históricas ante la situación del país" y se dispuso que el mensaje podría ser transmitido por todos los medios de comunicación. En el comunicado se señaló que la transmisión no tendría "ningún costo para el Estado Libre Asociado de Puerto Rico". Previo a la difusión del referido mensaje, el señor Gobernador no solicitó la autorización de la Junta Examinadora de Anuncios de la C.E.E.

El 1 de junio de 2005 el señor Gobernador transmitió el referido mensaje a través de una señal originada en el

Departamento de Noticias del Canal 6.  A dicha señal los

Canales 2, 4 y 11 se conectaron para retransmitirlo.

El texto del mensaje se reproduce, en lo pertinente,

a continuación:

> […] Hoy vengo a hablarte de la situación que atraviesa nuestro país y de cómo vamos a superarla. Est[á] bueno ya de que algunos políticos sigan retrasando tu progreso.
>
> Basta ya de espectáculos. En el Mensaje de Estado hice un llamado a que trabajemos juntos para enfrentar los problemas actuales y echar adelante a Puerto Rico. Presenté un plan que denominé el Triángulo del Éxito para combatir el crimen, poner la educación en el sitial que se merece y promover una nueva economía más fuerte, con más empleos.
>
> Ya se empieza a ver resultados; cortamos el gasto público, logramos una reducción en la criminalidad, incluyendo los asesinatos; cambiamos las prioridades de nuestro sistema educativo, creamos el programa Apoyo al de Aquí para generar empleos y sometimos decenas de medidas legislativas y el presupuesto que están pendientes de aprobación.
>
> Le he solicitado a la Legislatura que atienda responsablemente el presupuesto y los he convocado a que nos sentemos a trabajar juntos por el bien de Puerto Rico.
>
> Sin embargo, tú has visto que hay unos políticos que se han quedado en el pasado y se han dedicado a sus luchas de poder y no a trabajar por ti.
>
> Tú sabes qui[é]nes son.
>
> […] Aunque estamos viendo señales por parte de algunos legisladores que se han parado firmes, ya no se puede seguir aplazando la acción y el trabajo que necesita Puerto Rico.
>
> Está bueno ya.
>
> Yo tengo un plan y en las próximas semanas lo estarás viendo en acción.

Como tú Gobernador, en el ejercicio de mis prerrogativas y poderes, estaré haciendo públicas una serie de órdenes y acciones ejecutivas, para lo que no es necesaria la intervención de la Legislatura.

Estas acciones, entre otras, están dirigidas a darle los recursos que la Policía necesita; asignarle al Centro Médico los fondos que requiere urgentemente, al Departamento de Educación para que mejore las condiciones de las escuelas, para atacar de frente la evasión contributiva y darle apoyo a las empresas de aquí. Todo esto antes del 30 de junio.

Para esa fecha Puerto Rico necesita que la Asamblea Legislativa haya aprobado un presupuesto con los recursos para atender en el próximo año fiscal tus necesidades.

En un intento más por romper el tranque legislativo, mañana estaré anunciando la creación de un Comité Mediador Ejecutivo de Ciudadanos que tendrá la misión de mediar con la Asamblea Legislativa sobre el presupuesto. Invito a la Asamblea Legislativa a crear un Comité similar.

[…] La Asamblea Legislativa tiene que responder, pero si no lo hace, voy a utilizar todas las prerrogativas y poderes constitucionales que tengo como Gobernador para que el gobierno cumpla su misión y los fondos lleguen al pueblo, como tienen que llegar.

[…] A los que quieran trabajar por Puerto Rico va mi respeto y mi voluntad de cooperación, aun cuando existen diferencias ideológicas de criterio.

Pero a los que han escogido el camino del estancamiento y del sabotaje contra el pueblo, sean del partido que sean, les digo: podrán hacer el camino más difícil, pero me enfrentaré a ustedes y los vamos a dejar atrás.

Compatriota, ten la seguridad de que vamos a seguir adelante y vamos a superar la situación actual. Ya antes he librado batallas difíciles y he prevalecido con la

> fuerza de la verdad, de mis valores, de mi compromiso contigo. […]

En respuesta a la transmisión de este mensaje, el 3 de junio de 2005, al amparo de la Sección 7.1 del Reglamento, el Oficial Examinador del P.I.P., así como el del P.N.P. sometieron sendas solicitudes de investigación ante la Junta Examinadora de Anuncios de la C.E.E.[4] En éstas alegaron que el señor Gobernador y la Corporación de Puerto Rico para la Difusión Pública difundieron el mensaje en cuestión en violación a lo dispuesto en el Artículo 8.001 de la Ley Electoral, por razón de que lo hicieron sin obtener autorización previa para ello. A su vez, los Oficiales Examinadores cuestionaron la legalidad del contenido del mensaje por entender que, en lugar de ser de emergencia, fue de corte político-partidista.

Ese mismo día, amparándose en la Sección 4.2(B) del Reglamento, la Oficina Central de Comunicaciones de la Fortaleza presentó ante la Junta una Solicitud de Autorización para el Uso de Medios de Difusión indicando que el anuncio era de "interés público de urgencia".[5]

---

[4] La Sección 7.1(A) de Reglamento dispone que la Comisión podrá requerir la comparecencia de cualquier agencia a los fines de investigar el hecho de que cualquier información a difundirse o difundida por los medios de difusión fue autorizada previamente por la Comisión, se ajustó a los términos de una autorización concedida o si –en caso de que se hubiera publicado sin autorización– constituyó un anuncio requerido por ley.

[5] La Sección 4.2(B) del Reglamento contempla el no acogerse previamente al procedimiento de autorización establecido si existe "una situación extraordinaria de tal naturaleza que justifique la difusión" del anuncio de urgencia o emergencia y se somete dicha justificación

Señaló que "ante el escenario de incertidumbre económica y social que vive el país y ante la incertidumbre que atraviesa la Asamblea Legislativa", el señor Gobernador "estimó necesario informar a todos los puertorriqueños, con carácter de urgencia, sobre las prerrogativas constitucionales" que tiene para enfrentar inmediatamente la situación.

Aunque el señor Gobernador solicitó la desestimación de las querellas presentadas en su contra, la Junta celebró una vista en la que las partes pudieron defender sus posturas. Posteriormente, el entonces Presidente de la Junta, Hon. Ramón E. Gómez Colón, rindió un Informe en el que recomendó concluir que tanto el señor Gobernador como la Corporación violaron las disposiciones de la Ley Electoral, toda vez que tenían la obligación de solicitar autorización de la C.E.E antes de transmitir el mensaje por ese medio.

Insatisfecho, el Comisionado Electoral del Partido Popular Democrático llevó el asunto a discusión ante el seno de la C.E.E.

Luego de varios trámites, en noviembre de 2005, el entonces Presidente de la C.E.E., Hon. Aurelio Gracia Morales, acogió el Informe de la Junta y dictó una resolución. Al así hacerlo, resolvió que al emitir el mensaje, sin autorización previa, el señor Gobernador

_____

ante la C.E.E. dentro de las 48 horas laborables de la publicación del anuncio.

violentó lo dispuesto en el Artículo 8.001 de la Ley Electoral.[6]

Inconforme con la determinación de la C.E.E., el señor Gobernador presentó oportunamente un Escrito de Revisión Electoral ante el Tribunal de Primera Instancia. En dicho recurso alegó que el propósito del Artículo 8.001 de la Ley Electoral es uno que se circunscribe a límites específicos, por lo que la C.E.E. erró al concluir que lo infringió. Fundamentó su posición alegando que, en ausencia de una erogación directa de fondos públicos por parte del E.L.A. para la compra de tiempo y espacio en los medios de difusión, no estaba obligado a solicitar la autorización de la C.E.E. Por otro lado, sostuvo que la decisión editorial del Canal 6 de transmitir su mensaje y el uso de recursos para ello no podía configurar una violación de su parte al Artículo 8.001 de la Ley Electoral, ya que se trataba de una corporación pública con personalidad jurídica independiente. Finalmente arguyó que, aún asumiendo que el Estado hubiera incurrido en gastos, fue innecesario el

---

[6] Tomamos conocimiento judicial de que la C.E.E. resolvió de igual forma otra querella que se instó contra la Cámara de Representantes de Puerto Rico y su Presidente, Hon. José F. Aponte Hernández, en virtud de un mensaje que, sin previa autorización de la C.E.E, dicho funcionario transmitió a través de los medios de difusión pública en atención al mensaje difundido por el señor Gobernador. El querellado recurrió ante el Tribunal de Primera Instancia mediante un recurso de revisión electoral, el cual actualmente está pendiente de adjudicación. Véase, KPE-05-4923; Cámara de Representantes y otros v. Comisión Estatal de Elecciones y otros.

trámite previo ante la C.E.E. Ello no sólo porque el tranque suscitado en la Asamblea Legislativa para la aprobación del presupuesto para el año fiscal 2005-2006 configuró una situación de excepción, sino también porque sus expresiones no tuvieron connotaciones político-partidistas.

En respuesta a la revisión solicitada, la C.E.E. sometió su oportuna oposición. De igual forma, los Comisionados Electorales del P.N.P y del P.I.P. presentaron por separado unas solicitudes de intervención que fueron aceptadas por el tribunal.[7] Posterior a ello, el señor Gobernador solicitó que el juicio *de novo* se convirtiese en una vista argumentativa, toda vez que las controversias planteadas eran estrictamente de derecho.

Celebrada la vista, el Tribunal de Primera Instancia resolvió que, aunque no se pagó directamente por la transmisión del referido mensaje, no había controversia en cuanto a que hubo desembolso de fondos públicos para el pago de salarios de los empleados del Canal 6 y de La Fortaleza, por el uso de un edificio público y por otros gastos operacionales. En vista de ello, estableció que el Artículo 8.001 de la Ley Electoral debía interpretarse ampliamente y que el señor Gobernador lo había violado al

---

[7] El Canal 6 presentó su solicitud de revisión electoral fuera del término jurisdiccional de diez días establecido en el Artículo 1.016 de la Ley Electoral, 16 L.P.R.A. sec. 3016(a), y luego desistió del caso. Por ende, la decisión de la C.E.E. en lo que le respecta advino final, firme e inapelable.

no solicitar autorización de la C.E.E. previo a la difusión de su mensaje.

Inconforme con el dictamen de instancia, el Gobernador recurrió ante el Tribunal de Apelaciones. Dicho foro emitió una extensa sentencia mediante la cual revocó el dictamen recurrido. Al interpretar que el Artículo 8.001 es de naturaleza prohibitiva y punitiva, el Tribunal de Apelaciones determinó que su alcance debía interpretarse restrictivamente a base de la definición precisa de los términos utilizados. Señaló que la infracción del Artículo 8.001 de la Ley Electoral no se refiere a cualquier gasto de fondos públicos, sino a uno que implique una contraprestación para la *"adquisición onerosa* de tiempo y espacio en los medios de difusión pública"* y que tenga como "propósito diáfano" exponer logros y planes. Fundamentándose en estas interpretaciones, resolvió que el señor Gobernador no desembolsó fondos públicos para la compra de tiempo y espacio en los medios de difusión ni tampoco difundió propaganda político-partidista, por lo que no estaba sujeto a la obligación de obtener la aprobación previa de la C.E.E. para la transmisión de su mensaje. Asimismo, resolvió que se trató de un mensaje de urgencia y, en vista de ello, endosó la solicitud de autorización que el señor Gobernador presentó dentro de las 48 horas de haber emitido su anuncio, al amparo de la Sección 4.2(B) del Reglamento.

Inconformes con este dictamen, la C.E.E. y los Comisionados Electorales del P.N.P. y del P.I.P. recurrieron ante nos. En esencia, sostienen que erró el Tribunal de Apelaciones al no otorgarle deferencia a las determinaciones del foro de instancia; al entender que el Artículo 8.001 de la Ley Electoral debía interpretarse restrictivamente y al, de esta forma, concluir que el señor Gobernador no incumplió el referido estatuto cuando transmitió su mensaje el 1 de junio de 2005.

Examinadas las solicitudes presentadas, ordenamos la consolidación de los recursos y concedimos a todas las partes un término para expresar sus posiciones. Con el beneficio de sus comparecencias, resolvemos.

II

Antes de abordar la controversia sustantiva, debemos atender el señalamiento de la C.E.E. y del Comisionado Especial del P.I.P. en cuanto a que el foro intermedio se excedió en el alcance de su facultad revisora al concluir que el tribunal de instancia no llevó a cabo un juicio *de novo* y, en virtud de ello, colocarse en su misma posición al evaluar la prueba.

El proceso de revisión judicial de los asuntos ante la C.E.E. en cuanto a las impugnaciones de anuncios bajo la veda electoral se establece en el Artículo 1.016 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3016(a). De dicha disposición surge que se trata de una revisión en la cual los tribunales de instancia tendrán que

efectuar un juicio *de novo* de la determinación de la C.E.E. A esos efectos, deberán celebrar una vista en su fondo, recibir evidencia y formular las determinaciones de hecho y conclusiones de derecho que correspondan al revisar la decisión correspondiente. Id; Miranda v. C.E.E., 141 D.P.R. 775 (1996). En estos casos, el tribunal revisor tiene facultad de considerar todos los extremos de los asuntos planteados, tanto las determinaciones de hecho como las conclusiones de derecho.

En el caso ante nuestra consideración, las partes reconocieron ante el Tribunal de Primera Instancia que no existía controversia sobre los hechos y, por consiguiente, no presentaron evidencia en la vista celebrada. Las partes estipularon los hechos y argumentaron sus interpretaciones sobre el derecho aplicable. Basado en ello, el tribunal de instancia, luego de efectuar una interpretación independiente sobre la normativa aplicable, confirmó la determinación de la C.E.E.

Estando en la misma posición que el tribunal de instancia para interpretar el derecho aplicable a los hechos incontrovertidos, entendemos que el Tribunal de Apelaciones no se excedió en su facultad revisora al examinar las cuestiones señaladas y al formular sus propias conclusiones de derecho. Ya hemos establecido que no cabe hablar de deferencia judicial cuando la

controversia estriba en efectuar una interpretación estatutaria, toda vez que los tribunales están en igual posición para entenderla.

En vista de que el foro intermedio revocó los dictámenes del tribunal de instancia y de la C.E.E., ahora "radica en este Tribunal la función de ser intérprete final de las leyes y la Constitución, así como la definición de sus contornos y la determinación de la validez de su ejercicio." (*Citas omit*idas) P.P.D. v. Rosselló González II, 136 D.P.R. 916, 923 (1994).

Analizado este asunto preliminar, pasemos ahora a resolver la controversia sustantiva planteada ante nosotros.

### III.

### A.

Como cuestión de umbral, y por tratarse de una controversia novel, procede determinar si el Artículo 8.001 de la Ley Electoral, el cual prohíbe la difusión de anuncios gubernamentales en periodos de veda electoral, debe interpretarse ampliamente para hacer cumplir su propósito legislativo o si, en cambio, debe interpretarse de forma restrictiva por contener disposiciones de naturaleza punitiva.

La Sección 2 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico dispone que las "leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y

secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral." De ahí surge el deber ineludible del Estado y sus instrumentalidades de salvaguardar el principio de libre selección del pueblo, el cual pretende evitar que el Estado —mediante anuncios gubernamentales— pueda tener una influencia en la libre expresión de los ciudadanos en la votación, con el poder económico que éste tiene mediante la utilización de fondos públicos. P.P.D. v. Rosselló González II, *supra.* Esta protección del ciudadano contra toda coacción en el ejercicio de su prerrogativa electoral permea todo sufragio, tanto las elecciones generales como los referéndum y los plebiscitos. Id; Sánchez y Colón v. E.L.A. I, 134 D.P.R. 445 (1993).

Asimismo, nuestra Constitución también dispone en su Sección 9 del Artículo VI que "[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". A la luz de esta disposición, y a tono con el precepto anterior, en reiteradas ocasiones hemos expresado que el partido político al cual pertenece un Gobernador está impedido de utilizar los fondos o propiedad pública para promover su postura en menoscabo del axioma de igualdad electoral. Marrero v. Municipio de Morivis, 155 D.P.R.

653 (1984); P.P.D. v. Rosselló González I, 139 D.P.R. 643 (1995).

A esos efectos, toda actuación que tienda a crear una desigualdad indebida o desventaja no justificada entre unos partidos políticos y otros es impermisible constitucionalmente. P.N.P. v. Hernández, 122 D.P.R. 362 (1988).

Inspirada por este marco normativo, y en aras de crear un mecanismo de fiscalización para salvaguardarlo, la Asamblea Legislativa aprobó el Artículo 8.001 de la Ley Electoral de Puerto Rico, en el cual:

> Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro de enero del año en que debe celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.
>
> Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones. (*Énfasis nuestro*) 16 L.P.R.A. sec. 3351.

En virtud de los intereses envueltos, resulta pertinente recordar que estamos compelidos a interpretar el alcance del referido Artículo 8.001 de modo tal que prevalezca la importante política pública que lo inspira.

Chase Manhattan Bank v. Municipio de San Juan, 126 D.P.R.
759 (1990); C.E.E. v. Departamento de Estado, *supra*.
Ello en vista de que la veda dispuesta en el Artículo
8.001 es una medida, entre otras posibles, para
garantizar la paridad. La misma no determina, por sí
sola, el alcance del axioma de igualdad y paridad
económica entre partidos. Por ende, ante la clara
intención legislativa de proteger el principio de
igualdad electoral, resulta inevitable concluir que,
independientemente de las consecuencias que pueda tener
la infracción del estatuto, el alcance que se le ha
atribuido al mismo es amplio.[8]

B.

Luego de examinar la naturaleza del alcance del
Artículo 8.001 de la Ley Electoral, procede que
determinemos si en el presente caso se incurrió en gastos
para la compra de tiempo y espacio en los medios de
difusión que hicieran aplicable la referida disposición

---

[8] A tono con lo anterior, hemos sostenido como
principio fundamental de hermenéutica que:

> [a]l interpretar una disposición
> específica de una ley, principios
> perseguidos por la Asamblea Legislativa al
> aprobarla y nuestra determinación debe
> atribuirle un sentido que asegure el
> resultado que originalmente se quiso
> obtener […] Nuestra obligación fundamental
> en estos casos, es imprimirle efectividad
> a la intención legislativa, propiciando de
> esta forma la realización del propósito
> que persigue la ley […]. (*Citas omitida*)
> Irizarry v. Johnson and Johnson Consumer
> Products Co. (P.R.), Inc., 150 D.P.R. 155,
> 163 (2000).

legal y, por consiguiente, activaran la obligación de solicitar autorización para la difusión del mensaje especial.

Contrario a lo resuelto por la C.E.E. y el Tribunal de Primera Instancia, en el caso de marras el Tribunal de Apelaciones exoneró de responsabilidad al señor Gobernador por entender que no hubo un gasto directo para la "adquisición onerosa" del Estado de la compra de tiempo y espacio de difusión. El foro intermedio interpretó que la infracción al Artículo 8.001 no se refiere a cualquier gasto, sino al que implique un desembolso del funcionario o de la agencia como *contraprestación* del "tiempo y espacio de difusión" recibidos.

Aun cuando reconocemos que el razonamiento del Tribunal de Apelaciones es cónsono con una lectura literal del texto de la ley, estamos impedidos de acogerlo por entender que el mismo no está en armonía con nuestra jurisprudencia interpretativa sobre el alcance, propósito y contenido de la veda electoral.

No podemos acoger una interpretación que restrinja la facultad de la C.E.E. para examinar sólo aquellos mensajes que requieran el pago de un precio cierto para su transmisión. La ausencia de una "adquisición onerosa" a cargo de los fondos públicos no puede eximir del cumplimiento con la Ley Electoral ni con nuestra jurisprudencia interpretativa, toda vez que la intención

de dicho estatuto –conforme hemos visto– no sólo es evitar la influencia indebida del partido en el poder, sino también implantar la limitación impuesta a los funcionarios gubernamentales por el Artículo VI, Sección 9 de la Constitución de Puerto Rico, relativa al uso apropiado tanto de propiedades como de fondos públicos. Véase, P.S.P. v. Secretario de Hacienda, 110 D.P.R. 313 (1980). Marrero v. Municipio de Morovis, *supra*; P.P.D. v. Rosselló González I, *supra*.

A la luz de lo anterior, y dado el carácter novel de esta controversia, procede aclarar que, **vigente una veda electoral, el mecanismo de solicitar la aprobación de la C.E.E. para difundir anuncios o mensajes –aún en situaciones de interés público– aplica ya sea por el desembolso directo de fondos públicos, el aprovechamiento de la propiedad pública o bien por el uso indirecto de otro tipo de beneficios, gastos o subvenciones derivados de recursos públicos.** Esta interpretación amplia del estatuto está en armonía con nuestros pasados pronunciamientos sobre el tema. Véase, P.P.D. v Rosselló González II*, supra;* Miranda v. C.E.E., *supra*; P.N.P. v. Hernández, *supra*. De igual forma, es cónsona con una lectura integrada de la Ley Electoral.[9]

---

[9] La Ley Electoral específicamente prohíbe el uso de las estaciones de radio y televisión propiedad del Estado Libre Asociado de Puerto Rico por el partido de gobierno para fines político-partidistas. 16 L.P.R.A. sec. 3110. De igual forma, al referirse a los costos de producción de la publicidad de los partidos señala que se deberá informar cualquier contribución en forma de bienes o

En el presente caso, no está en controversia que se utilizaron propiedades y empleados gubernamentales para coordinar la producción y transmisión del mensaje objeto de este litigio ni que el referido mensaje se difundió con los recursos del Canal 6, el cual es un medio perteneciente a una corporación pública –es decir, a una entidad gubernamental– que está sujeta a los límites constitucionales y estatutarios que regulan el deber de información del Gobierno.[10]

En vista de ello, si bien es cierto que el señor Gobernador no incurrió en el gasto de un precio cierto para la compra del tiempo y espacio de difusión, entendemos que sí se benefició del uso de las facilidades públicas, de los medios de producción, de los empleados públicos y gastos ordinarios –tanto de la Oficina del Gobernador como de la Corporación de Puerto Rico para la Difusión Pública– para la transmisión de un mensaje a través del canal de televisión del E.L.A.  En virtud de

---

servicios, tales como, vehículos, estudios, encuestas u otros de cualquier naturaleza, cuyo propósito sea promover el triunfo o la derrota de un partido o candidato. 16 L.P.R.A. sec. 3113. Finalmente, entre los gastos que la Ley contempla que se pueden sufragar con dinero del Fondo Electoral, se encuentran los "gastos generales de oficina, incluyendo cánones de arrendamiento, servicios en Puerto Rico de teléfono, telégrafo y correo; servicios de agua y energía eléctrica, gastos de viaje, equipo y maquinarias". 16 L.P.R.A. sec. 3118.

[10] Véase, Ley Orgánica de la Corporación de Puerto Rico para la Difusión Pública, Ley Núm. 216 de 12 de septiembre de 1996, 27 L.P.R.A. sec. 501 *et seq.*

lo anterior, la difusión de su mensaje estaba ceñida por lo dispuesto en el Artículo 8.001 de la Ley Electoral.

IV.

Aclarada la aplicabilidad del Artículo 8.001 de la Ley Electoral y, por ende, de la obligación de solicitar autorización de la C.E.E. para difundir el referido mensaje, debemos examinar si las circunstancias del caso configuraron alguna situación de excepción que justificara obviar el trámite ordinario.

Amparándose en la obligación del Gobernador de mantener informado al Pueblo sobre los asuntos que lo afectan, y tomando en consideración las dificultades que vislumbraba como Primer Ejecutivo por el tranque gubernamental generado por dos de las Ramas del Gobierno, el Tribunal de Apelaciones entendió que la justificación que la Oficina del Gobernador envió a la C.E.E. dentro de las 48 horas siguientes al mensaje cumplió el propósito legislativo. Fundamentó lo anterior en que el mensaje era de urgencia.

Conforme a la discusión que precede, el Artículo 8.001 de la Ley Electoral prohíbe el uso de las facilidades públicas, medios de producción, empleados públicos y gastos ordinarios para difundir un mensaje con el propósito de exponer programas, proyectos, logros, realizaciones, proyecciones o planes. Ahora bien, la referida disposición contempla dos excepciones, a saber: permite la difusión de (a) aquellos avisos y anuncios

expresamente requeridos por ley y (b) aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia que requieren la aprobación de la C.E.E. 16 L.P.R.A. sec. 3351. Ello en concordancia con lo dispuesto en la Sección 9 del Artículo VI de nuestra Constitución.

Conforme al Reglamento para el Control de Gastos de Difusión Pública del Gobierno para el Referéndum del 10 de julio de 2005, una urgencia o emergencia constituye una:

> Situación de carácter súbito o imprevisto, ocasionada por actos del hombre o de la naturaleza, que requiere la inmediata divulgación de información por parte de una agencia, según el ámbito de sus deberes y funciones, a los fines de proteger la vida, la propiedad o los derechos de la ciudadanía. Sección 1.4(16).

El referido Reglamento contempla y regula el mecanismo procedente para transmitir anuncios ante tales situaciones de emergencia o urgencia. A esos efectos, la Sección 4.2 dispone:

> (A) En aquellos casos en que cualquier agencia considere con **razonable certeza** que, durante el periodo de vigencia de este reglamento, **pudiera** surgir una situación o situaciones de tal naturaleza que, de ocurrir, justificarían la difusión de información de urgencia o emergencia mediante anuncios por los medios de difusión, podrá someter, ante el Secretario, en cualquier momento, previa a la difusión del anuncio, una solicitud de autorización para la emisión de tales anuncios en caso de la ocurrencia de la situación o situaciones contempladas en la solicitud.

(B) En los casos en que la agencia considere que existe una <u>situación extraordinaria de tal naturaleza</u> que justifique la difusión de anuncios de urgencia o emergencia, sin que se hubiese acogido al procedimiento de autorización establecido en el inciso anterior, tendrá que, no más tarde de las cuarenta y ocho (48) horas laborables, luego de la publicación del anuncio, radicar una justificación sobre la publicación ante la Comisión. (*Énfasis nuestro*).

Del primer párrafo de la sección antes citada, surge que la agencia tiene la facultad de hacer una determinación <u>inicial</u> sobre el carácter urgente o de emergencia del mensaje que pretende difundir. Dicha determinación debe estar basada en la creencia de que es <u>razonablemente certera la posibilidad</u> de que durante el periodo de veda electoral surja "una situación o situaciones de tal naturaleza que, <u>de ocurrir</u>, justificarían la difusión de información de urgencia o emergencia". Es decir, el Reglamento no limita la difusión de un mensaje a la absoluta certeza de la ocurrencia del hecho, sino que atiende situaciones en las que cabe la posibilidad de que no ocurra un evento que justifique un pronunciamiento de emergencia.

Ahora bien, las disposiciones legales antes discutidas, así como nuestra jurisprudencia, son claras al establecer que incluso en las referidas situaciones en las que se necesite divulgar información de emergencia o urgencia es necesario solicitar la aprobación previa de la C.E.E. para la difusión. Es decir, el hecho de que la información a ofrecerse sea de interés público, de

urgencia o de emergencia no justifica obviar el mecanismo de fiscalización establecido en la Sección 4.2(A) del Reglamento, independientemente de que la divulgación afecte de forma significativa el bienestar de la ciudadanía en general o de que su difusión sea vital e indispensable.

Por tanto, aunque en el contexto administrativo el concepto "emergencia" no necesariamente se limita a una circunstancia imprevista, sino que comprende un suceso o combinación y acumulación de circunstancias que exigen inmediata actuación, Meléndez Ortiz v. Valdejully, 120 D.P.R. 1 (1987), dicha situación no es suficiente para fundamentar la legalidad de acogerse al mecanismo de autorización posterior a la difusión del mensaje.

Para acogerse al referido mecanismo de excepción contemplado en la Sección 4.2(B) del Reglamento, se requiere que exista "una situación extraordinaria" que justifique prescindir del procedimiento legal ordinario para la difusión de mensajes urgentes. Sin embargo, es preciso aclarar que, aun cuando es imperante la regulación de las expresiones gubernamentales emitidas mediante el uso de recursos públicos, ni el Reglamento ni la Ley Electoral de Puerto Rico definen o establecen parámetros para determinar bajo qué circunstancias se justifica prescindir de la autorización previa requerida por la Ley. Por ende, las situaciones en las que se exima a la agencia o funcionario del cumplimiento con la

obligación de solicitar la previa autorización deben evaluarse cuidadosamente.

Si bien la determinación de urgencia o emergencia se basa en un criterio relativo a la razonable certeza de la **posibilidad** de un suceso, la determinación de circunstancias extraordinarias y excepcionales –a saber, la "situación extraordinaria" contemplada en la Sección 4.2(B) del Reglamento– debe basarse en un criterio de **inminencia**. En este sentido, las circunstancias extraordinarias son aquellas en las que existe una inminente lesión al interés público, de modo que una demora en la expresión gubernamental ofenda el sentido de la justicia; ocasione daños irreparables; perjudique los derechos constitucionales de la ciudadanía; derrote el orden de ley e incida indefectiblemente sobre la sana convivencia social.

Conforme a lo anterior, **sólo si la situación, además de ser de emergencia o urgencia, es de carácter extraordinario o excepcional se podría justificar la difusión del anuncio sin haber solicitado aprobación previa de la C.E.E. Ello siempre que se someta ante dicha entidad una justificación de la publicación de excepción dentro de las 48 horas siguientes a su transmisión.**

En el presente caso, el señor Gobernador transmitió su mensaje especial el 1 de junio de 2005, al día siguiente de que su Oficina emitiera un comunicado de

prensa informándole a la ciudadanía la futura comparecencia. Fundamentó la urgencia del mensaje en la situación de incertidumbre generada en el país por el tranque en la aprobación del presupuesto. Aunque no cabe duda de que el señor Gobernador, en virtud del cargo que ocupa, puede comunicarse con sus representados sobre los asuntos que afectan al País, la vigencia de una veda electoral impone límites al modo en que esa comunicación se debe efectuar.

En vista de estos límites, entendemos que no existía una situación extraordinaria de tal naturaleza que justificara la difusión del mensaje luego de que se transmitiera. Aunque somos conscientes de los conflictos que había entre los poderes políticos sobre la confección del presupuesto para el año fiscal 2005-2006, el señor Gobernador tenía suficiente tiempo para solicitar la autorización de la C.E.E. en cualquier momento antes de la transmisión de su mensaje. El mero hecho de que el referido mensaje se hubiera anunciado previo a su difusión constituye un fundamento adicional para demostrar que no había una situación imprevisible, inminente y excepcional que le impidiera acogerse al procedimiento ordinario de solicitud de autorización.

V.

Finalmente, procede que examinemos el contenido del mensaje en controversia, toda vez que los peticionarios arguyen que el mismo no configuró un gasto revestido de

interés público ni se ajustó a los parámetros del Artículo 8.001 de la Ley Electoral al difundir información prohibida por la veda electoral.

Sabido es que la búsqueda de un fin público es la condición positiva de toda actuación estatal. P.P.D. v. Rosselló González I, *supra*; Marrero v. Municipio de Morovis, *supra*. En vista de ello, nuestro ordenamiento jurídico no permite utilizar fondos, propiedades o recursos públicos para fines partidarios, esté o no en vigor una veda electoral.

El Reglamento para el Control de Gastos de Difusión Pública del Gobierno, vigente para la veda electoral ante nuestra consideración, reconoce en su Declaración de Propósitos la responsabilidad que tiene el gobierno de poner a los ciudadanos en conocimiento de los diversos aspectos de interés público. Precisamente, define "información de interés público" como sigue:

> Toda divulgación que afecte en forma significativa los derechos, las obligaciones, o el bienestar de la ciudadanía en general, en el ámbito de responsabilidad de cada agencia del gobierno, según sus deberes y funciones y que por ser vital e indispensable se requiere que la ciudadanía advenga en conocimiento de la información propuesta. Sección 1.4(5).

Aunque no podemos incidir sobre el ejercicio legítimo de los poderes constitucionales de las otras Ramas de gobierno, hemos resuelto que la determinación inicial que tomen los poderes públicos sobre lo que es fin público es revisable por el Poder Judicial. P.I.P. v. C.E.E., 120 D.P.R. 580 (1988).

Conviene recordar que en P.P.D. v. Rosselló González I, *supra,* tuvimos la oportunidad de examinar el concepto del fin público en el contexto de la divulgación de información gubernamental. En esa ocasión, señalamos que dicho concepto:

> no es estático, sino que está ligado al bienestar general y que tiene que ceñirse a las cambiantes condiciones sociales de una comunidad específica, a los problemas peculiares que éstas crean y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad compleja. Su significado ha cobrado un marco dimensional de naturaleza liberal, generalmente prevaleciendo el criterio de que los objetivos que estén contenidos en el referido fin público deben redundar en beneficio de la salud, seguridad, moral y bienestar general de todos los ciudadanos. Id, pág. 686.

En armonía con esa óptica, y en aras de determinar si hay un fin público envuelto en la expresión gubernamental, nuestra jurisprudencia ha ido delimitando algunos criterios no taxativos para guiar nuestro ejercicio adjudicativo. Aplicados al contexto del presente caso, la información de interés público durante el periodo de veda electoral:

> (1) Redunda en beneficio de la salud, la seguridad, la moral y el bienestar general de todos los ciudadanos;
>
> (2) Está destinado a una actividad de carácter público o semipúblico;
>
> (3) Promueve los intereses y objetivos de la entidad gubernamental, en consonancia con sus deberes y funciones o la política pública establecida;
>
> (4) Promueve programas, servicios, oportunidades y derechos, o adelanta

causas sociales, cívicas, culturales, económicas o deportivas.

(5) Promueve el establecimiento, modificación o cambio de una política gubernamental. P.P.D. v. Rosselló González I, *supra,* pág. 691.

Sin embargo, **el análisis sobre el fin público no se detiene con la determinación de si está presente alguno de estos criterios.** En P.P.D. v. Rosselló González I, *supra,* págs. 690-691, aclaramos que:

cuando el Gobierno, en el ejercicio de su facultad o deber de informar a la ciudadanía, utiliza o incorpora símbolos, emblemas, colores, fotografías o lemas de naturaleza político-partidista, estamos impedidos constitucionalmente de reconocerle fin público alguno a dicha expresión gubernamental. Tampoco podemos reconocer validez constitucional a cualquier expresión gubernamental difundida mediante el uso de fondos públicos cuando ésta claramente constituye un subterfugio para conferir una ventaja a un candidato o a un partido político, o para adelantar sus intereses político-partidistas.

De lo anterior se desprende que si se determina que el anuncio gubernamental se pretende utilizar como una vía para que un partido o candidato obtenga ventaja sobre otro -o para adelantar algún fin particular- el objetivo legítimo se anula y el anuncio no podrá justificarse o prevalecer. En efecto, en el referido caso resolvimos específicamente que:

la publicación de expresiones gubernamentales mediante el uso de fondos públicos para la consecución de cualquiera de los objetivos enunciados anteriormente, en algunas ocasiones, puede tener el efecto incidental de producir cierto grado de ventaja al partido político en el poder o a

un candidato de dicho partido. **Pero cuando la evidencia demuestra**, por el contrario, **que dicha expresión es utilizada como un vehículo para adelantar cualquier fin individual de dicho partido o candidato, anulando de tal forma la consecución de un objetivo legítimo,** <u>tal expresión no puede prevalecer por constituir una ventaja económica a dicho partido o candidato por sobre los partidos políticos o candidatos de oposición</u>. (*Énfasis nuestro*) Id, págs. 691-692.

Conforme a ello, la prohibición del Artículo 8.001 "aunque amplia, no es absoluta, veda aquellos anuncios y publicaciones, directa e indirectamente, que de una u otra forma enaltecen o divulgan las ejecutorias del Gobierno." <u>Coss v. C.E.E.</u>, 137 D.P.R. 877, 885 (1995).

En el caso de autos, independientemente de si el señor Gobernador tenía potestad para informarle al país sobre la naturaleza de las diferencias entre las Ramas Ejecutiva y Legislativa con relación a la confección del presupuesto para el año fiscal 2005-2006, del texto del mensaje se desprende que él aprovechó la ocasión para divulgar logros y planes de su gobierno e incorporó información con propósitos político-partidistas vedada por el ordenamiento electoral durante la celebración del Referéndum sobre el Sistema Cameral.[11]

Por un lado, en el referido mensaje se expusieron los planes del gobierno para atender los problemas más

---

[11] En efecto, el propio Tribunal de Apelaciones afirmó que "el Gobernador utilizó un tono *inapropiado* en algunas partes del mensaje e hizo referencia innecesaria a algunos logros y proyectos de su administración, los que ya había descrito con detalle en el mensaje de estado."

apremiantes del país.[12]   Asimismo, el señor Gobernador señaló los resultados de su gestión gubernamental: "cortamos el gasto público, logramos una reducción en la criminalidad, incluyendo los asesinatos; cambiamos las prioridades de nuestro sistema educativo, creamos el programa Apoyo al de Aquí para generar empleos y sometimos decenas de medidas legislativas y el presupuesto que están pendientes de aprobación." Finalmente, el referido funcionario aprovechó la difusión de su mensaje especial para realizar una crítica directa a sus opositores políticos.[13]

En atención a la naturaleza de los principios que la normativa electoral pretende proteger, y en aras de armonizar los mismos tanto con el texto de la ley como con nuestra jurisprudencia interpretativa, debemos concluir que el mensaje en controversia sirvió como un vehículo para obtener una ventaja política indebida sobre los candidatos o partidos de oposición.  Siendo así, el fin público que pudo haber motivado la expresión gubernamental en las circunstancias de este caso no subsana la invalidez de su contenido a la luz de los parámetros establecidos por la normativa electoral.

---

[12] A esos efectos, sostuvo: "Presenté un plan que denominé el Triángulo del Éxito para combatir el crimen, poner la educación en el sitial que se merece y promover una nueva economía más fuerte, con más empleos."

[13] Indicó que está "bueno ya de que algunos políticos sigan retrasando tu progreso" y luego reiteró que éstos se habían quedado en el pasado, que se habían dedicado a sus luchas de poder y no a trabajar para el Pueblo.

VI.

Por los fundamentos antes expuestos, revocamos la sentencia emitida por el Tribunal de Apelaciones por entender que no procedía la difusión del mensaje gubernamental objeto de la controversia ante nuestra consideración sin la previa autorización de la C.E.E.

No obstante, reconocemos que nunca antes se había resuelto que, además de desembolsos directos de fondos públicos, el aprovechamiento de propiedad y recursos públicos también constituyen "gastos" al amparo del Artículo 8.001 de la Ley Electoral. De igual forma, ésta es la primera vez que esbozamos unos criterios para determinar lo que constituye una situación extraordinaria que justifique difundir un anuncio o mensaje sin solicitar previamente la autorización de la C.E.E. a esos efectos.

En vista de lo anterior, la actuación del señor Gobernador se dio en ausencia de unas pautas precisas en cuanto a la aplicabilidad de la referida disposición legal en las circunstancias de este caso. Esto es evidente si tomamos en consideración que el Tribunal de Apelaciones determinó que el mensaje difundido no violó la Ley Electoral. Por tanto, resolvemos que la normativa aquí establecida debe tener efecto prospectivo y en consecuencia no será aplicada al caso de autos ni a todo aquél que esté pendiente de adjudicación ante el Tribunal de Primera Instancia y el Tribunal de Apelaciones que

envuelva una controversia sobre la aplicabilidad del Artículo 8.001 de la Ley Electoral y su Reglamento que se origine del mensaje difundido por el Gobernador Acevedo Vilá el 1 de junio de 2005. Véase, Gorbea Vallés v. Registrador, 131 D.P.R. 10 (1992); Quiles Rodríguez v. Supte. De la Policía, 139 D.P.R. 272 (1995); Isla Verde Rental Equipment Corp. v. García Santiago, res. el 31 de agosto de 2005, 2005 TSPR 122.

Se dictará Sentencia de conformidad.


                                        FEDERICO HERNÁNDEZ DENTON
                                             Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Aníbal Acevedo Vilá          *
Corporación de Puerto Rico        *
para la Difusión Pública          *
   Recurrido                      *
                                  *
            v.          *     CC-2006-813
                        *     CC-2006-819
Comisión Estatal de Elecciones    *
   Peticionaria                   *
********************************   Certiorari
Hon. Aníbal Acevedo Vilá;         *
Corporación de Puerto Rico        *
para la Difusión Pública          *
   Recurridos                     *
                                  *
            v.          *     CC-2006-815
                        *
Comisión Estatal de Elecciones,   *     **Consolidados**
Junta Examinadora de Anuncios,    *
Juan Dalmau Ramírez, Comisionado  *
Electoral del Partido             *
Independentista Puertorriqueño,   *
y Geraldo A. Cruz Maldonado,      *
Comisionado Electoral del         *
Partido Popular Puertorriqueño    *
   Partes                         *
                                  *
Thomas Rivera Schatz,             *
Comisionado Electoral del         *
Partido Nuevo Progresista         *
   Peticionario                   *
********************************

SENTENCIA


San Juan, Puerto Rico, a 27 de diciembre de 2007.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la sentencia emitida por el Tribunal de Apelaciones por entender que no procedía la difusión del mensaje gubernamental objeto de la controversia ante nuestra consideración sin la previa autorización de la C.E.E.

No obstante, reconocemos que nunca antes se había resuelto que, además de desembolsos directos de fondos públicos, el aprovechamiento de propiedad y recursos públicos también constituyen "gastos" al amparo del Artículo 8.001 de la Ley Electoral. De igual forma, ésta es la primera vez que esbozamos unos criterios para

determinar lo que constituye una situación extraordinaria que justifique difundir un anuncio o mensaje sin solicitar previamente la autorización de la C.E.E. a esos efectos.

En vista de lo anterior, la actuación del señor Gobernador se dio en ausencia de unas pautas precisas en cuanto a la aplicabilidad de la referida disposición legal en las circunstancias de este caso. Esto es evidente si tomamos en consideración que el Tribunal de Apelaciones determinó que el mensaje difundido no violó la Ley Electoral. Por tanto, resolvemos que la normativa aquí establecida debe tener efecto prospectivo y en consecuencia no será aplicada al caso de autos ni a todo aquél que esté pendiente de adjudicación ante el Tribunal de Primera Instancia y el Tribunal de Apelaciones que envuelva una controversia sobre la aplicabilidad del Artículo 8.001 de la Ley Electoral y su Reglamento que se origine del mensaje difundido por el Gobernador Acevedo Vilá el 1 de junio de 2005. Véase, Gorbea Vallés v. Registrador, 131 D.P.R. 10 (1992); Quiles Rodríguez v. Supte. De la Policía, 139 D.P.R. 272 (1995); Isla Verde Rental Equipment Corp. v. García Santiago, res. el 31 de agosto de 2005, 2005 TSPR 122.

Así lo pronuncia y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez no intervino.


                                        Aida Ileana Oquendo Graulau
                                        Secretaria del Tribunal Supremo